ROBERTS v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. December 14, 1903.)

No. 1,256.

1. HOMICIDE—MANSLAUGHTER—"WILLFULNESS."

In a prosecution for homicide, an instruction that the term "willfully," as used in Rev. St. U. S. § 5341 [U. S. Comp. St. 1901, p. 3628], defining manslaughter as the unlawful and willful killing of another without malice, means a killing done wrongfully and with evil intent, committed by an act which a person of reasonable knowledge and ability must know to be contrary to duty, and that, while the act must be done with evil design and knowingly, a killing under circumstances showing a reckless disregard for the life of another, and the reckless and negligent use of means calculated to take the life of another, would be a willful killing, as defined, was proper.

2. SAME—REQUESTED INSTRUCTIONS—REFUSAL.

Where a proposition contained in a requested instruction has been included in the charge given, the request may be properly refused.

3. SAME—APPLICATION TO EVIDENCE.

Where a requested instruction in a prosecution for manslaughter, while correct in itself, did not fully state the law applicable to the case before the court, it is properly refused.

4. SAME—EXCEPTIONS.

Where an exception taken to an instruction given in answer to a request by the jury for further instructions was for the reasons given in exceptions to the original charge, which was elaborated by the instruction given, it was insufficient to cover an objection that the judge did not answer the question of the jury categorically or specifically.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

Roberts was indicted for murder, and convicted of manslaughter. The bill of exceptions shows:

"That on the trial of this cause the following facts were adduced by the government: The deceased, Henry Hyler, and his son A. V. Hyler had resided at and near Perry, Oklahoma, for about 15 months prior to October 4, 1894, on which date, between 10 and 11 o'clock a. m., they and their respective wives, and Mrs. J. O. Bryant, a daughter of the deceased, left Perry, en route for Dallas, Texas. About ten days prior to leaving Perry the deceased sold his land claim, and about a week prior A. V. Hyler sold his land claim. Both the deceased and his son A. V. Hyler were indebted to the law firm of which the defendant was a partner for services rendered on behalf of the Hylers in both civil and criminal cases, and were also indebted to other persons in Perry. That, in addition to selling his claim, the deceased sold his household furniture, and that he and A. V. Hyler left Perry without paying the amount due to the defendant's law firm and other persons, and left with the intention of abandoning that country as their home. That the deceased, his son, and the ladies of the party arrived at Purcell, Indian Territory, and were compelled to wait there until the arrival of the through train for Dallas, Texas. That they did wait there until about 2 o'clock the next morning, when they went to the depot to take the train to Dallas. That when the train arrived they started to board it, but were met by the defendant, who told them to consider themselves under arrest; that he had a warrant for them. That, when he was asked what they were arrested for, the defendant pulled a paper from his pocket and read it, or pretended to read it. It was to arrest A. V. and Henry Hyler, and have them before some person at Perry. That, in accordance with a suggestion that

¶ 3. See Criminal Law, vol. 14, Cent. Dig. § 1979.

the ladies should be taken to a hotel, the whole party proceeded to the Canadian Hotel, being accompanied by a man named Carlton, the night watchman of the Santa Fé Depot, who was also a special deputy U. S. marshal, and who was requested by the defendant to help him take care of his prisoners, there being no jail or calaboose in Purcell. On arriving at the Canadian Hotel, A. V. Hyler set down his little valise in the office of the hotel, and the deceased set down a little basket he was carrying, and walked up to a little table with a lamp on it. He took some money from his right-hand pants pocket, and started to give it to his wife to pay her expenses with while he was gone, and Roberts grabbed his hand and got some of the money. A. V. Hyler then grabbed Roberts, and Carlton caught hold of A. V. Hyler and pulled him off, and they all got into a scuffle. The deceased got loose from Roberts, and Roberts drew his pistol and chased deceased around the room two or three times, and said that if he did not give him that money he would kill him. The deceased ran out of the door, and Roberts followed immediately after; and Mrs. J. O. Bryant, a daughter of deceased, immediately after Roberts, begging him not to shoot her father. Deceased ran out of doors and disappeared in the darkness, and Roberts went to about 4 or 5 feet from the paling and shot. When Hyler ran out of the room, Roberts was 6 or 8 feet behind him, and it was about 5 to 10 seconds after they went out until the shot was fired. Mrs. Bryant had her hand on Roberts' arm when he shot, begging him not to shoot. The deceased was not armed; neither was his son, nor any of the ladies. After the shooting Roberts walked back to the hotel office, and the wife of the deceased asked him if he had shot her husband; and he said he shot to kill, or intended to kill him, or had a right to kill him. That Matt Cook, a deputy U. S. marshal, of Purcell, just before the shooting, received a telegram from the defendant, asking him to arrest Henry and A. V. Hyler. That he went to the train and ascertained that the parties were under arrest. That while at the depot his attention was attracted by screaming, and he heard one voice say, 'Don't shoot my father;' and another, 'Don't shoot my husband.' The next he saw was the flash of a gun or a pistol, and then the report almost in front of the Canadian Hotel. That Cook went to the hotel, and found Roberts standing there—whether on the porch or ground he could not say—with a pistol in his hand. He said that he had two prisoners, and that one of them had escaped, and asked Cook to help him look for him. Cook told the defendant that he was an officer, and defendant asked him if he was the man to whom he (defendant) had sent the telegram, and Cook replied in the affirmative. Cook asked the defendant if he reckoned he had hit the man when he fired, and he replied that it was not his fault if he did not. Roberts and a Mr. Ben Goode, another deputy U. S. marshal, went off to search the train for the deceased; and, while they were gone, Cook and Mrs. J. O. Bryant found the body of the deceased just east of the southeast corner of the hotel, between the hotel and the next building, and just inside and north of a paling fence that extended down the hill from the southeast corner of the veranda of the hotel. The Canadian Hotel is a two-story frame building, with porches upstairs and down, extending the whole distance on the south and east sides of the building. The office was in the southwest corner, downstairs, and the light in the office—the only light testified to in the hotel—was on a table near the southwest corner of the room. Mr. Cook stated, from appearances, it looked as if the deceased had fallen over a paint bucket, one of the legs of the body being still on it, the feet being almost against the picket fence, and right about where there was a hole that looked as if it was made with a 44 or 45 caliber pistol through one of the pickets, about two and a half feet from the ground. The body was lying on the face, east and west, with the head east. After the finding of the body, on or near which no weapons whatever were discovered, Cook went to the depot in search of Roberts, but, failing to find him, returned to the hotel, where he found Roberts, and told him of the body being found. Roberts then said that he had shot to scare and stop the deceased, but that he thought he heard him running off through the weeds. At the time of the first statement Roberts was somewhat excited, but at the time of the last statement he was much cooler. At the southeast corner of the

hotel, in the presence of Cook and a man named Carter, Roberts stated that he shot at Hyler, and that he was right at Hyler, or words to that effect, when he fired. He [the defendant] pointed to a place in the railing, and said 'he went through there.' Roberts said at the time he stated that one of his prisoners had escaped that Hyler had run off—out off the end of the porch. Roberts, Cook, Carter, and Goode went to the end of the porch, and Roberts pointed to where he went off. From Cook's chest to where the body was found was about 8 feet, but they did not see the body at that time. It was a starlight night, with no moon. Deceased had $3 in silver in his pockets, and one copper cent, and in his drawers he had $680 sewed up. This money was turned over to Mrs. Bryant. After the shot was fired, A. V. Hyler was handcuffed by Carlton, and the cuffs remained on him until Roberts instructed Cook to have him released, which was done. Roberts had been arrested at the time A. V. Hyler was released. There were no lights in front of the hotel, the only light being a lamp in the office. The ground in front of the hotel was nearly level, but sloped off abruptly at the southeast corner of the building. Roberts, the defendant himself, testified on the witness stand that' he knew he had no authority whatever to make any arrest of either of the Hylers while in the Indian Territory, and that he intentionally cocked and fired the pistol, the ball from which killed Henry Hyler. This ball passed through a picket fence, just on the inside of which the body was found, and passed through the head of the deceased near the right ear, and coming out over the left temple, causing instantaneous death. On the evening of October 4, 1894, defendant went to the post office at Perry and got a Colt's 45 pistol, and said something about a collection, and that he needed that money and was going to have it.

"The testimony adduced for the defendant showed: That his reputation as a peaceable, law-abiding citizen, and for honesty and integrity, in the community in which he lived, was good. The Statutes of Oklahoma (1893) §§ 2433, 1850, were introduced, and a copy of the complaint before the justice of the peace, Holt, on [an] officer of Oklahoma, on which the warrant for the arrest of the Hylers was issued, and the commission of the defendant as a deputy U. S. marshal for Oklahoma Territory, was introduced in evidence. That the deceased and his son were indebted to the firm of Allen & Roberts, of which the defendant was a member, in the sum of between $50 and $75, for legal services rendered. That the deceased had been asked for the money, but had refused to pay it. There was a conversation between the defendant and Mr. Allen, his law partner, as to the matter of extradition papers, if the Hylers should be arrested by the defendant out of Oklahoma Territory. That in a conversation between the defendant and the county attorney of Noble county, Oklahoma, in which county Perry is located, the defendant was given permission to secure a warrant for the arrest of the Hylers for fraudulent insolvency, made a penal offense by the statutes of Oklahoma introduced in evidence and was advised by the county attorney how to proceed in case extradition papers should become necessary; and the defendant was informed that, if the Hylers were found in the Indian Territory, that he could detain them on the warrant in evidence for a reasonable time, until he could get extradition papers. That the county attorney had not advised with the Governor of Oklahoma Territory about requisition papers in this particular case, but knew his mind about such cases in general, and what he was in the habit of doing. That both Henry Hyler and A. V. Hyler were indebted to Dr. W. B. Brengle, of Perry, for medical services, and left without paying him, and that he put his bills in the hands of the defendant for collection the day before the killing occurred the next morning. That defendant told Dr. Brengle that he was going down to make a collection, but did not state where he was going. That H. A. Johnson, an attorney of Perry, held a claim against Henry Hyler, and on asking him for it, after he had sold his claim, Hyler had put his hand on his pocket and said the money was there, and for Johnson to get it if he could. The defendant testified he thought he had obtained the pistol from his own office, and had no recollection of getting it from the witness Burlingame, nor had he any recollection of saying anything about a collection, or that he needed the money, and was going to have it, as testified to by witnesses for the Government; but he admitted that he

might have got the pistol from Burlingame—it was possible. That, after obtaining the warrant for the arrest of the Hylers, the defendant left Perry, taking the pistol with him; having been warned by a Mr. Taylor, a deputy sheriff, that the Hylers were dangerous people. That defendant arrived at Purcell, Ind. T., about 2 o'clock in the morning, and saw the deceased and A. V. Hyler when he got off the train, with the ladies with them. That he stepped up to them and told them he had a warrant for their arrest, and afterwards reads the warrant to them. That there was no jail or calaboose in Perry, but that Mr. Carlton told him that he had handcuffs and chains for taking care of prisoners. Accompanied by Mr. Carlton, the whole party returned to the Canadian Hotel; the defendant warning Carlton that the men were dangerous, and not to allow them to pass anything one to another. On arriving at the office of the hotel, A. V. Hyler attempted to open his valise, and Carlton told him not to do so, and he desisted and did not open it. Henry Hyler undertook to pass something to his wife—what it was, the defendant did not know—but he put his hand on Hyler's shoulder and told him not to do that, and that at that time the two Hylers and one woman, the defendant thought, jumped on him and commenced beating and striking him. Carlton pulled young Hyler off, and he returned again, and was again pulled off. In the meantime Henry Hyler had run out of the doorway. The defendant started to follow him, but stopped an instant, thinking young Hyler was stabbing Carlton, as he was striking him. But seeing that young Hyler did not have a knife, the defendant ran out of the door, and three or four steps off the gallery into the street. He could not see the deceased, and stooped down, to see if he could skylight him. Hearing a noise to his left, and in a direction towards his back, he turned and ran towards a fence. Seeing he would run into the fence, he stopped, and hollered once or twice, and then fired down towards the ground at an angle of 45 degrees to scare and stop him. He then went back into the house, and, when Mrs. Bryant asked him if he had shot her father, he wanted to impress her and young Hyler that he was in earnest in making the arrest, and said that, if he had not, it was not his fault, or words to that effect. That he fired the pistol intentionally, but had no intention or wish to hit the deceased. That he did not know the deceased was anywhere near when he fired, and that, if he had known it, that he would certainly not have fired. That he was a strong young man, weighing about 190 pounds, and the deceased was an old man, weighing about 115 or 120 pounds. That he could have carried the deceased back to the hotel without inflicting any injuries on him if he had known that he was there. That he had no ill feelings whatever towards the deceased, and that the killing was an accident. That the defendant did not say that he had a right to shoot the deceased, but asked if he did not have a right to shoot for the purpose of scaring him and making him stop. There was no light in front of the hotel, and it was impossible to see the deceased after he went out of the office door. That the defendant did not say to Cook, pointing to the banisters of the porch, which were covered with vines, except a space of two feet at one place, that that was the way the deceased went, but did say that that was the way he must have gone. That the defendant had never been in Purcell before, and did not know how the land lay there, or that it sloped as it did down from the hotel. That he thought, when assisted by an Indian Territory marshal, he had a right to detain the Hylers until an extradition could be secured. That he did not request that A. V. Hyler be handcuffed. That he fired the pistol intentionally, but did not shoot where he heard the noise. That the ball did not go near where the noise was, and that there was no noise at the place where the ball did go. About ten minutes after the shot was fired, Cook was looking for Hyler, and, on going between the Canadian Hotel and the building next door, he struck a match and discovered the body. At that time Cook's feet were almost against the feet of the deceased, but Cook did not see the body until the match flared up, on account of the darkness. It was denied by the defendant that Mrs. J. O. Bryant was with him at the time the shot was fired; and Mrs. S. J. Ward, a witness for the defendant, stated that she was standing at the southeast corner of the gallery of the Canadian Hotel, upstairs, at the time the shot was fired, and saw the outlines of the defendant, and that she saw

no one else. He denied taking any money from deceased, and it appeared from the testimony of all witnesses that no complaint was made by any of the Hylers of any money being taken.

"In regard to manslaughter, the trial judge charged as follows:

" 'Manslaughter, at common law, is the unlawful killing of a human being, without malice, express or implied. A homicide is manslaughter when committed with the design to kill, under the influence of sudden and violent passion, caused by great provocation, which the law, in its tenderness to the infirmity of human nature, considers such a palliative as to rebut the presumption which would otherwise arise of malice. In the definition of manslaughter contained in the statute, the killing must be done unlawfully and willfully. The term "unlawfully," as here used, means without legal excuse. The term "willfully" here means done wrongfully, with evil intent. It means any act which a person of reasonable knowledge and ability must know to be contrary to duty, and, while the act must be done with evil design, and knowingly, as herein stated, still a killing which takes place under circumstances showing a reckless disregard for the life of another, and the reckless and negligent use of means reasonably calculated to take the life of another, such killing would be willfully done, as the term is herein defined.'

"Which portion of the court's said charge was excepted to by the defendant because: 'First, the jury are not instructed whether they are to be governed by the common law or the statutory definition of manslaughter, or both. Because, second, the said charge involves the definition of involuntary manslaughter at common law, while the statute of the United States denounces only voluntary manslaughter when unlawfully and willfully committed. Because, third, the said charge on manslaughter is inconsistent, in that it instructs the jury that, in order for a homicide to constitute manslaughter, there must be a design to kill, and further that the killing must be done with evil design and knowingly, and also instructs the jury in the same paragraph "that a killing which takes place under circumstances showing a reckless disregard for the life of another, and the reckless and negligent use of means reasonably calculated to take the life of another, would be willful killing." Because, fourth, the said charge, in defining the word "willfully," is incomplete and misleading, and fails to state that it means intentionally, designedly, and not accidentally. And because, fifth, the said charge instructs the jury that a killing from negligence or carelessness could constitute manslaughter under the laws of the United States. Because, sixth, said charge fails to instruct the jury affirmatively that if, at the time defendant fired his pistol, he did not know and had no reason to believe that deceased was within the range of his pistol at the time he fired it, in the way he fired it, and did not intend to hit or injure deceased or anybody else when he fired it, and had no reason to believe he would or could hit and injure anybody by firing it in the way he fired it, he would not be guilty of a willful killing.'

"After such charge had been given, the defendant requested the court to charge as follows:

" '(1) If you believe from the evidence that the defendant unlawfully and willfully, but without malice, shot and killed Henry Hyler, you will find defendant guilty of manslaughter.

" '(2) "Willfully," as used in the foregoing instructions, means intentionally and designedly.'

"This charge was refused by the court, and not submitted to the jury, to which action of the court the defendant at the time excepted.

"After the jury had retired to consider their verdict, they came into the court and asked further instructions as follows:

" 'The jury wishes to know of the court whether, if the defendant did not know Hyler was behind the fence, and fired promiscuously, he could be guilty of manslaughter.'

"Whereupon the court repeated to the jury the definition of the word 'willful' as embodied in the original charge, and herein set forth in a previous exception, and added the following thereto:

" 'Did the killing of Henry Hyler take place under circumstances showing a reckless disregard for the life of another, and did it take place by the reck-

less and negligent use of means reasonably calculated to take the life of another? At the time of the killing was the defendant's conduct such as showed a reckless disregard for the life of another, and was the use of the pistol which he had in his possession at that time so reckless and negligent in character as was calculated to take the life of this man whom he followed out of that hotel? If the jury answers both of these questions in the affirmative; if the jury say to the first question that the killing took place under circumstances showing a reckless disregard for the life of Henry Hyler, and that it took place by the use on the part of the defendant of his pistol in a reckless and negligent manner, and in a manner calculated to take the life of another—then the definition of "willfully done," as contained herein, will be fulfilled. You understand me? These are the two questions which will be answered by you.'

"To all of which further charge of the court, as above·set forth, the defendant, by counsel, then excepted, for the reasons embodied in his exceptions to the original charge on manslaughter."

Cecil H. Smith, for plaintiff in error.

H. B. Birmingham, U. S. Atty.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. Section 5341, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3628], reads:

"Manslaughter. Every person who, within any of the places or upon any of the waters described in section fifty-three hundred and thirty-nine, unlawfully and willfully, but without malice, strikes, stabs, wounds, or shoots at, or otherwise injures another, of which striking, stabbing, wounding, shooting, or other injury such other person dies, either on land or sea, within or without the United States, is guilty of the crime of manslaughter."

All the questions raised in the court below and assigned as error here depend for solution upon the construction—that is, the signification, purpose, and effect—of the word "willfully," as used in the above section. The word is in frequent use in criminal and penal statutes—sometimes alone, where its meaning is to be found in connection with a description of the act or thing prohibited, and often in connection with such words as "unlawfully," "knowingly," "wantonly," and "maliciously," where the meaning is determined by the whole context. In the above section the word is used in connection with the words "unlawfully" and "but without malice," and all are evidently intended to characterize the act of striking, stabbing, wounding, or shooting, which, resulting in death, is declared manslaughter. "Willful" is defined by Webster: "(1) Of set purpose; self-determined; voluntary; as willful murder. (2) Governed by the will without yielding to reason; obstinate; perverse; inflexible; stubborn; refractory." But it seems clear that in the section under consideration the purpose or determination required must not be so known, fixed, obstinate, calculated, or foreseen as to warrant therefrom the implication of malice.

It is not to be overlooked that in section 5341 Congress was differentiating manslaughter from murder on common-law lines—the two offenses to be exactly alike, except as to the ingredient of malice. In his first charge to the jury, the trial judge, after defining manslaughter at common law, said:

"In the definition of manslaughter contained in the statute, the killing must be done unlawfully and willfully. The term 'unlawfully,' as here used, means

without legal excuse. The term 'willfully' here means done wrongfully, with evil intent. It means any act which a person of reasonable knowledge and ability must know to be contrary to duty, and, while the act must be done with evil design and knowingly, as herein stated, still a killing which takes place under circumstances showing a reckless disregard for the life of another, and the reckless and negligent use of means reasonably calculated to take the life of another—such killing would be willfully done, as the term is herein defined."

We understand this to define "willfully" as acting voluntarily with evil intent or design, and that it may be shown by acting with reckless disregard of the life of another, coupled with the use of means reasonably calculated to take such life.

Considering that the evidence for the government showed that Roberts made an unlawful assault upon Henry Hyler with a deadly weapon, and followed up such assault by closely pursuing and intentionally shooting and killing said Hyler, and that the evidence for Roberts tended to show that while he made the assault, and pursued Henry Hyler, and intentionally fired his revolver, he did not see him, nor knowingly shoot at him, but fired as it were in the dark, with intent merely to scare and stop him, and considering that the correctness of a charge should be somewhat determined by the actual case presented, we conclude that, in the charge above referred to, the trial judge properly instructed the jury, within the true sense and meaning of section 5341, to be applied to the case then before the court. And we think that this conclusion is fully supported by the adjudged cases.

Under a statute (Clay's Dig. p. 472, c. 15, § 4) declaring "who shall willfully maim," etc., it was held: "If such an act is intentionally and unnecessarily committed, there can be no doubt it is willfully committed." State v. Abram, 10 Ala. 930, 932.

"Willful" is not the synonym of "voluntary." In truth, they express no distinct idea which is common to both. The former is a word of much greater strength than the latter. "Willful," in regard to manslaughter, denotes government by the will, without yielding to reason; obstinate; stubborn; perverse; inflexible. McManus v. State, 36 Ala. 291.

In a statute denouncing "any person who willfully interrupts or disturbs," etc., it was held that "the word 'willfully' was used as the synonym of 'intentionally' or 'designedly'; 'pursuant to intention or design, without lawful excuse.'" Harrison v. State, 37 Ala. 156.

In a statute declaring, "whoever shall willfully obstruct any highway," etc., "willfully" was construed to mean not only intentionally, but wrongfully, in bad faith, with evil intent or legal malice. State v. Preston, 34 Wis. 675.

Under a statute providing that "every person who shall willfully and maliciously kill, maim or disfigure horses," etc., the word "willfully" means intentionally, and the word "maliciously" imports a criminal motive, intent, or purpose. Commonwealth v. Brooks, 9 Gray, 303. This case followed and approved in Commonwealth v. McLaughlin, 105 Mass. 463.

Under a statute which provides that "if any person knowing himself not to be a qualified voter shall, at any election, willfully give in a

vote," etc. (Rev. St. 1836, c. 4, § 6), it was held that "the admission that the defendant voted was sufficient to support the averment that he voted willfully." The court said:

"Considering the manner in which the word 'willfully' is used in the statute, the court are of opinion that this was right. It may sometimes mean 'corruptly' or 'unlawfully,' but in this section, where the gist of the offense consists in the clause 'knowing himself not to be a legal voter,' the term 'willfully' means 'designedly,' 'purposely,' 'with an intent to claim and exercise,' etc." Commonwealth v. Bradford, 9 Metc. (Mass.) 270.

"In a penal statute the word 'willful' means more than it does in common parlance. It means with evil intent or legal malice, or without reasonable ground for believing the act to be lawful." Citing State v. Preston, 34 Wis. 675; State v. Clark, 29 N. J. Law, 96; Savage v. Tullar, Brayton, 223; United States v. Three Railroad Cars, 1 Abb. U. S. 196, Fed. Cas. No. 16,513. "In common parlance it is used in the sense of intentional, as distinguished from accidental or involuntary. To make the killing of the sheep, therefore, a willful act, it must have been committed with an evil intent, with legal malice, and without legal justification." Thomas v. State, 14 Tex. App. 204. To the same purport, see Sam Lane v. State, 16 Tex. App. 172; Wood v. State, Id. 574; Schubert v. State, Id. 645. See, also, Owens v. State, 19 Tex. App. 249, where the court approved "by 'willfully,' as used in this charge, is meant that the act was done without reasonable ground to believe the act of taking was lawful."

Murphy v. Commonwealth, 22 S. W. 649, is a case decided by the Court of Appeals of Kentucky, which is so interesting on the inquiry that we give it in full:

"Lewis, J. The only ground suggested by counsel for reversal of judgment in this case is the third instruction, as follows: 'Even if the jury believe from the evidence that the shooting and killing of William Gray was accidental, yet, if they believe that said accidental shooting and killing was the result alone of the reckless, careless use of a loaded pistol in the hands of the defendant, they should find the defendant guilty of voluntary manslaughter, and fix his punishment at confinement in the penitentiary of the state for a period of not less than two nor more than twenty-one years, in their discretion.' We do not see any error in that instruction, for an offense which may be either murder or manslaughter, according to attending circumstances, is correctly described in that instruction. The only reason that could exist for condemning the instruction is lack of evidence authorizing the court to give it, and, even in view of the evidence in the case it was proper for the court to give it. The deceased was a boy 11 years of age, accused being 15 or 16 years old. The deceased, accompanied by a woman, went to a place in the woods for the purpose of carrying dinner to two men, who, with the accused, were engaged in getting saw logs. The deceased was asked by one of the men to preach, but, upon his refusal, accused drew a loaded pistol, and, pointing it at his toes, told him he would shoot him if he (deceased) did not preach, and continued pointing it at him until deceased ran under a log for protection, in the meantime crying from fright. Afterwards accused started away from the place, and, by pursuasion, deceased was induced to accompany him. When they had gotten about 150 yards, and out of sight, a pistol shot was heard by the others, who, when reaching the place, found the little boy with a wound in the breast, and dead. Accused stated that the shot was purely accidental, and resulted from his falling and striking the pistol that was in the scabbard against a rock, and that he did not at the time have the pistol pointed at deceased, or even drawn; but to another person he admitted, on the day after the killing, that he had the pistol pointed at deceased, and the shot was

caused by his finger accidentally slipping upon the trigger. There was evidence sufficient to authorize the jury to believe and find death occurred under circumstances of such reckless and gross carelessness as to make the homicide manslaughter, of which accused was found guilty."

When we turn to the United States cases we find:

In considering a penal clause of a revenue act providing that "if any distiller shall knowingly and willfully omit, neglect," etc., the Supreme Court of the United States held that the "words 'knowingly' and 'willfully' implied not only a knowledge of the thing, but a determination with an evil intent to do it or to omit doing it"; and the court quoted with approval Chief Justice Shaw, to the effect that "willfully," in the ordinary sense in which it is used in the statutes, means not only voluntary, but with a bad purpose. Felton v. United States, 96 U. S. 699, 702, 24 L. Ed. 875.

The definition here given of the word "willfully" is approved in Potter v. United States, 155 U. S. 446, 15 Sup. Ct. 147, 39 L. Ed. 214; in Spurr v. United States, 174 U. S. 734, 19 Sup. Ct. 815, 43 L. Ed. 1150; both cases arising under the penal clauses of the national banking act. It has been followed in United States v. Smith (D. C.) 27 Fed. 859; North Carolina v. Vanderwood (C. C.) 35 Fed. 287.

In a revenue statute prescribing penalties for "willfully removing official seals from property," etc. (Act Cong. June 27, 1864, c. 164, § 5, 13 Stat. 198), Judge Hall, of the Northern District of New York, held that the word "willfully," as ordinarily used in the penal statutes, implied wicked purpose or perverse disposition, or, indeed, any evil or improper motive, intent, or feeling, or, to characterize an act done wantonly, or one which a man of reasonable knowledge must know to be contrary to his duty. United States v. Three Railroad Cars, 1 Abb. U. S. 196, 201, Fed. Cas. No. 16,513.

In construing the same section (Rev. St. U. S. 5341 [U. S. Comp. St. 1901, p. 3628]), Judge Maxey, in charging the jury, said:

"Manslaughter is said by Mr. Blackstone (4 Bl. Comm. 191) to be the unlawful killing of another without malice, express or implied, which may be voluntary, upon a sudden heat, or involuntary, but in the commission of some unlawful act. Voluntary manslaughter, as defined by the common-law writers, is an intentional killing in hot blood, without malice; and 'involuntary manslaughter, according to the old writers, is where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part, not amounting to felony, or from a lawful act negligently performed.' 1 Whart. Crim. Law (8th Ed.) § 305. But the distinction above adverted to between voluntary and involuntary manslaughter is now obsolete at the common law, and becomes here immaterial. Any unlawful and willful killing of a human being without malice is manslaughter, and, thus defined, it includes a negligent killing, which is also willful. It is insisted by the defendant's counsel that the killing was by misadventure—a mere accident— with no formed intent on the part of the defendant to kill Horan. I have told you that to constitute manslaughter the killing must be willful—must be willfully done. The word 'willfully,' says a text-writer, 'sometimes means little more than plain "intentionally" or "designedly." Yet it is more frequently understood to extend a little further, and approximate the idea of the milder kind of legal malice; that is, as signifying an evil intent, without justifiable excuse.' 1 Bish. Crim. Law, § 428. Now in this case it is not insisted that there was an altercation between deceased and the defendant, and that the killing was committed in sudden heat. Manslaughter, however, may exist where there is no evidence of sudden heat of passion; as, for

example, where the killing results from the negligent use of dangerous agencies, as firearms. The rule is thus stated by Mr. Wharton: 'Whoever possesses a dangerous agent must take such care of it as good business men, under such circumstances, are accustomed to apply; and if, from his neglecting to exercise such care, death ensue to another, he is liable for manslaughter.' Whart. Crim. Law, § 343. But, gentlemen, you must accept this rule with the qualification or explanation that the killing must also be willfully committed, as the word 'willfully' is defined in a foregoing part of this charge." United States v. Meagher (C. C.) 37 Fed. 880, 881.

If the first charge given was correct, then the refusal to charge thereafter as follows: "(1) If you believe from the evidence that the defendant unlawfully and willfully, but without malice, shot and killed Henry Hyler, you will find defendant guilty of manslaughter. (2) 'Willfully,' as used in the foregoing instructions, means intentionally and designedly"—was proper, because the first proposition was included in the charge given; and the second, while perhaps correct so far as it goes, does not fully state the law applicable to the case before the court.

What has just been said as to the second proposition of the first request fully applies to the third request. If the first charge was correct, the instructions given to the jury in response to the question: "The jury wishes to know of the court whether, if the defendant did not know Hyler was behind the fence, and fired promiscuously, he could be guilty of manslaughter"—must also be approved. It is to be noted that no exception was taken to the fact that the judge did not answer the question categorically or specifically. The answer given was emphasizing and somewhat elaborating the definition of "willfully" as given in his first charge, and the exception taken was for the reasons given in exceptions to the original charge.

This disposes adversely of all the assignments of error, and our attention is called to none not assigned, but patent on the face of the record.

The judgment of the Circuit Court is affirmed.