## UNITED STATES v. PRAEGER.

(District Court, W. D. Texas, San Antonio Division. January 2, 1907.)

### No. 1,920.

1. JURY—WAIVER.

In a proceeding to punish a civilian for refusal to testify before a general military court-martial, under Act Cong. March 2, 1901, c. 809, 31 Stat. 950, 951 [U. S. Comp. St. 1901, p. 965], providing that for a witness' willful refusal to testify and to answer proper questions he shall be subject to a fine of not more than $500 or imprisonment not to exceed six months, or both, at the discretion of the court, the parties may waive a jury by written stipulation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 31, Jury, §§ 197–199.]

2. WITNESSES—REFUSAL TO TESTIFY—WILLFULNESS.

Act Cong. March 2, 1901, c. 809, 31 Stat. 950, 951 [U. S. Comp. St. 1901, p. 965], provides that every person not belonging to the army of the United States who, being duly subpœnaed to appear as a witness before a general court-martial of the army, "willfully" neglects or refuses to appear, or refuses to testify, etc., shall be guilty of a misdemeanor, provided that no witness shall be compelled to incriminate himself or to answer any questions which may tend to incriminate or degrade him. *Held*, that where a civilian so subpœnaed was advised by competent counsel that certain

questions asked of him with reference to a publication concerning an army rifle contest, if answered, might subject him to a civil or criminal prosecution for libel, and for this reason he refused to answer on advice of counsel, and not from any evil intent, or with legal malice, his refusal did not constitute a violation of such act.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 37–41, 1008.]

3. SAME—PRODUCTION OF DOCUMENTS.

Where a witness subpœnaed to produce certain documents before a military court-martial testified that he had destroyed the documents before service of the subpœna, his failure to produce did not constitute a willful refusal to produce such documents within Act Cong. March 2, 1901, c. 809, 31 Stat. 950, 951 [U. S. Comp. St. 1901, p. 965], making such act a misdemeanor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 25, 40.]

4. ARMY AND NAVY—COURTS-MARTIAL—STATUTES.

The acts of Congress touching army and navy courts-martial established in the United States are constitutional.

5. SAME—DETERMINATIONS—CONCLUSIVENESS.

Where a military court-martial has jurisdiction of the person accused and of the offense charged, and acts within the scope of its lawful powers, its decisions and sentence cannot be reviewed or set aside by the civil courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Army and Navy, §§ 94, 95.]

6. SAME—JURISDICTION—WITNESSES—REFUSAL TO TESTIFY—POWER TO PUNISH.

Under Rev. St. § 1342, 86th article of War [U. S. Comp. St. 1901, p. 964], providing that a court-martial may punish at its discretion any person who uses any menacing words, signs or gestures in its presence, or who disturbs its proceedings by any riot or disorder, such court has no final jurisdiction over a civilian subpœnaed to testify before it or power to punish him for contempt for refusing to testify.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Army and Navy, § 91.]

7. SAME—DECISIONS—CONCLUSIVENESS.

Where a civilian witness was subpœnaed to testify before a general court-martial, and refused to answer certain questions because the answers might tend to incriminate him, the decision of such court that the questions were proper was not conclusive on the civil courts of the question whether the witness was guilty of contempt in refusing to answer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Army and Navy, §§ 94, 95.]

## Prosecution for Refusal to Testify before Court-Martial.

The questions submitted for consideration arise upon an information, filed by the district attorney pursuant to the following act of Congress, entitled an "act to prevent the failure of military justice and for other purposes," approved March 2, 1901:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that every person not belonging to the army of the United States who, being duly subpœnaed to appear as a witness before a general court-martial of the army, willfully neglects or refuses to appear, or refuses to qualify as a witness or to testify or produce documentary evidence which such person may have been legally subpœnaed to produce, shall be deemed guilty of a misdemeanor, for which such person shall be punished on information in the district court of the United States; and it shall be the duty of the United States district attorney, on the certification of the facts to him by the general court-martial, to file an information

against and prosecute the person so offending, and the punishment of such person, on conviction, shall be a fine of not more than five hundred dollars or imprisonment not to exceed six months, or both, at the discretion of the court: Provided, that this shall not apply to persons residing beyond the state, territory, or district in which such general court-martial is held, and that the fees of such witness, and his mileage at the rates provided for witnesses in the United States district court for said state, territory or district shall be duly paid or tendered said witness, such amounts to be paid by the pay department of the army out of the appropriation for compensation of witnesses: Provided, that no witness shall be compelled to incriminate himself or to answer any questions which may tend to incriminate or degrade him." Act March 2, 1901, c. 809, 31 Stat. 950, 951 [U. S. Comp. St. 1901, p. 965].

It appears from the record that, upon the trial by general court-martial at Ft. Sam Houston, Tex., of Post Quartermaster Sergeant Eber I. Sharp, of the United States army, who was charged with conduct to the prejudice of good order and military discipline, the defendant, Otto Praeger, was subpoenaed as a witness in behalf of the government, and that, during the trial of Sharp, Praeger refused to answer certain questions propounded by the judge advocate, Lieut. Ellery Farmer, and failed to produce a written communication, described in the following statement, duly certified to the district attorney by the court-martial:

"One Otto Praeger, a resident of San Antonio, Bexar county, Tex., a witness for the prosecution, in the trial of Post Quartermaster Sergeant Eber I. Sharp, United States army, charged with conduct to the prejudice of good order and military discipline, in violation of the Sixty-Second article of war, having been duly subpoenaed according to law to appear before this general court-martial, and being further required, by said subpoena, to bring with him, to be used in evidence, in said cause, the following described document, to wit, a written communication from Post Quartermaster Sergeant Sharp, United States army, received by him about August 2, 1904, sent from Ft. Reno, Oklahoma Territory, about August 1, 1904, containing certain statements that appeared in an article entitled 'Bad features in the conduct of the Ft. Reno rifle shoot' in the San Antonio Daily Express of August 3, 1904, unlawfully did refuse to testify, as such witness, and to produce the documentary evidence aforesaid, which he had been legally subpoenaed to produce, when required to do so by this court. Whereupon it is ordered by the court that in compliance with the provisions of section one of the act of Congress, approved March 2, 1901, c. 809, entitled 'An act to prevent the failure of military justice, and for other purposes,' that the facts aforesaid be certified to the United States District Attorney for the Western District of Texas by this court, to the end that he shall file an information against, and prosecute, said Otto Praeger, so offending as aforesaid, in accordance with the terms of said act. To all of which certification is here made according to law and duly signed by the president of this court by its orders, and attested by the judge advocate thereof."

Upon receipt of the certified statement of facts the district attorney, by leave of the court, filed an information against the defendant, Praeger, the material part of which reads as follows:

"And the said Henry Terrell, attorney as aforesaid, who, after examination of the charge contained in the said certification of the proceedings of said general court-martial, finds that there is probable cause to require the said Otto Praeger, mentioned in said certification of said proceedings, to answer in this court, and therefore the said attorney charges: On the 5th day of November, A. D. 1904, before a general court-martial of the army, duly appointed to meet at Ft. Sam Houston, Tex., on the 16th day of September, A. D. 1904, pursuant to special order No. 183, headquarters department of Texas, and by command of Brig. Gen. Lee, commanding said department of Texas, and within the western district of Texas, and within the jurisdiction of this court, one Otto Praeger, late of said district, and of the county of Bexar, and city of San Antonio, being a person not belonging to the army of the United States, and being duly subpoenaed to appear as a witness before said general court-

martial of the army, and being duly and legally subpœnaed to produce certain documentary evidence required by the said general court-martial, willfully did refuse to testify before said general court-martial, and willfully did refuse to produce the said documentary evidence which he, the said Otto Praeger, had been legally subpœnaed to produce. And the said United States attorney further says: That the fees of said witness Otto Praeger and his mileage, at the rates provided for witnesses in the United States District Court for the Western District of Texas, have been duly paid to the said Otto Praeger."

The proceeding against Sharp before the court-martial had its origin in the following communication, which, it was charged, he wrote and caused to be published in the San Antonio Daily Express, in its issue of August 3, 1904:

"Ft. Reno, O. T., July 3. The infantry rifle competition of the Southwestern Division for 1904, just completed, was a notable contest in many respects, and not the least notable for its irregular mode of conduct.

"Coaching, though strictly forbidden in regulations, was nevertheless permitted in certain instances, to the discouragement of those who were away from their homes.

"Officers and ladies were allowed to follow their favorites down the skirmish range and protests availed nothing.

"Competitors were allowed to draw for their target and order of fire the day preceding the shooting, until this practice developed some ingenious dishonesty. On Friday morning Private Barr, Company M, Thirtieth Infantry, in making a skirmish run, tore the paper off his prone figure entirely. An investigation followed by which it was discovered that some one had worked hard the night before and placed about 60 pounds of small stones just beneath the surface of the ground in front of this figure. A number of other figures were doctored in like manner, but were not used. At first the range officer decided to give Barr 99 points; this brought forth a flood of protests and the controversy was finally settled by throwing out the score, and allowing another run.

"Musician Monks, Company K, Twenty-Ninth Infantry, was disqualified and ruled off for firing on another's target, though the same offense was overlooked in other cases.

"Competitors from Ft. Reno were allowed too many advantages for a fair competition.

"The worst feature of the competition was the mess. There is no visible reason why the mess should not have been excellent, as $2.00 in addition to the government ration, for each soldier, should have been sufficient, but instead it was sorely inadequate, both in quantity and quality, this causing a severe bowel trouble among 60 per cent. of the visiting competitors, and although the condition of the mess was known, it was not corrected.

"The competition has manifested the injustice of officers and soldiers competing with each other. One officer was permitted to use his sling so attached to his body with rubber bands as to make it a task to detach himself, or even to 'harness up' without help. This same officer had a coach with field glasses who called his score at two hundred yards.

"There is no doubt that the winners earned their places fair and square, but the contest had many unfair and unjust features that could only indicate the existence of favoritism, though perhaps the result was not changed thereby."

It is not important to consider the matter of the trial, conviction and sentence of Sharp by the court-martial. But a consideration of the foregoing letter becomes essential in view of the defendant's alleged connection with it as night editor of the San Antonio Daily Express. Although the information does not so charge, yet it is really based upon the refusal of the defendant to testify in reference to this letter, and upon his failure to produce it in obedience to the subpœna.

By written stipulation of the attorneys, a jury was waived, and all matters of law and fact were submitted to the court for determination. And it was further stipulated that the record of the court-martial should constitute the record and facts of the cause.

Charles A. Boynton, U. S. Dist. Atty., and Captain C. D. Roberts, for the United States.

Carlos Bee and Ogden & Brooks, for defendant.

MAXEY, District Judge (after stating the facts). It is thought proper to observe in the outset that the following grave constitutional question confronts the court at the threshold of the case: Is it competent for the defendant to waive a jury and submit the cause to the determination of the court? The punishment provided by the act of Congress, upon conviction, "shall be a fine of not more than five hundred dollars or imprisonment not to exceed six months, or both, at the discretion of the court." While in view of the punishment prescribed by the statute, the question is involved in doubt, the court is inclined to the opinion that, in a case like the present one, the parties have the right, under the authority of Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99, by written stipulation to waive a jury. See, also, Stell v. State, 14 Tex. App. 59. It may be further remarked that the court entertains serious doubt as to the sufficiency of the information filed against the defendant, in that the pleader merely sets out the general language of the statute without alleging specifically any offense which the defendant was supposed to have committed. United States v. Hess, 124 U. S. 487, 488, 8 Sup. Ct. 571, 31 L. Ed. 516; Evans v. United States, 153 U. S. 587, 14 Sup. Ct. 934, 38 L. Ed. 830. But neither demurrer nor motion to quash has been interposed, and the court will proceed to consider such questions—and such questions only—as may be deemed absolutely essential to the proper determination of the case.

In view of the allegations of the information, it becomes the duty of the court to determine whether the evidence, as embodied in the record of the court-martial, establishes beyond reasonable doubt the guilt of the defendant. To arrive at a correct solution of the question the exact charge preferred against the defendant, by the information, must be kept steadily in view. It is this: That the defendant willfully refused to testify before the general court-martial, and willfully refused to produce the documentary evidence, which he had been legally subpœned to produce. Do the facts disclose that he willfully refused either to testify or to produce the letter? That he refused to answer certain questions and failed to produce the letter demanded, is not only admitted, but it is clearly shown by the record. But the question remains, was the refusal, in the one case and failure in the other, willful? If not willful it follows that judgment must go in favor of the defendant. "Doing or omitting to do a thing knowingly and willfully," said the Supreme Court, in Felton v. United States, 96 U. S. 702, 24 L. Ed. 875, "implies not only a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it. 'The word willfully,' says Chief Justice Shaw, 'in the ordinary sense in which it is used in statutes, means, not merely voluntarily, but with a bad purpose.' Com. v. Kneeland, 20 Pick. (Mass.) 220. 'It is frequently understood,' says Bishop, 'as signifying an evil intent without justifiable excuse.' 1 Crim. Law, § 428." See, also, Potter v. United

States, 155 U. S. 446, 15 Sup. Ct. 144, 39 L. Ed. 214. Referring to the word willful as employed in a penal statute, Judge Pardee, speaking for the Circuit Court of Appeals, in Roberts v. United States, 126 Fed. 904, 61 C. C. A. 427, quoted with approval the following language used by the Court of Appeals of Texas in Thomas v. State, 14 Tex. App. 204:

"In a penal statute the word willful means more than it does in common parlance. It means with evil intent, or legal malice, or without reasonable ground for believing the act to be lawful. State v. Preston, 34 Wis. 675; State v. Clark, 29 N. J. Law, 96; Savage v. Tullar, Brayton (Vt.) 223; United States v. Three Railroad Cars, 1 Abb. U. S. 196, Fed. Cas. No. 16,513. In common parlance it is used in the sense of intentional, as distinguished from accidental or involuntary."

"To the same purport," said Judge Pardee, "see Sam Lane v. State, 16 Tex. App. 172; Wood v. State, Id. 574; Shubert v. State, Id. 645. See, also, Owens v. State, 19 Tex. App. 249, where the court approved 'by willfully, as used in this charge, is meant that the act was done without reasonable ground to believe the act of taking was lawful.'" It was said by Mr. Chief Justice Stayton, speaking for the Supreme Court of this state, in State v. Alcorn, 78 Tex. 393, 14 S. W. 664:

"It is universally held that the word 'willful' when used in a penal statute means with evil intent or without reasonable ground to believe the act lawful."

Keeping in view the meaning of the word willful, in its application to penal offenses and as it is used in the present information, the court is of the opinion that, if the defendant, in refusing to answer the questions propounded by the judge advocate, and in failing to produce the communication described in the subpœna, had reasonable grounds to believe that the answer to the questions and the production of the communication would tend to criminate him (see act March 2, 1901, c. 809, 31 Stat. 951 [U. S. Comp. St. 1901, p. 965]) then he would not be guilty of a willful refusal in either case, although his refusal may have been based upon an erroneous conception of the rules of evidence. In other words, if the defendant was really and in good faith impressed with the belief that the testimony, sought to be elicited by the judge advocate, would if produced tend to show that he had himself committed the offense of libel, the refusal to produce it would not be willful within the meaning of the law. To reach a satisfactory conclusion as to the conduct of the defendant as a witness before the court-martial, the facts appearing of record should be consulted. It is shown that a general court-martial was regularly convened at Ft. Sam Houston, to try Post Quartermaster Sergeant Eber I. Sharp, upon the following charge and specification:

"Charge: Conduct to the prejudice of good order and military discipline, in violation of the Sixty-Second article of war.

"Specification: In that Post Quartermaster Sergeant Eber I. Sharp, United States army, being on duty at Ft. Reno, Oklahoma Territory, in connection with the southwestern division infantry rifle competition, did, to the manifest prejudice of good order and military discipline, write and cause to be published in the San Antonio Daily Express, in its issue of August 3, 1904, a communication criticizing the official conduct of his superior officers and others."

The communication referred to in the specification is set out in the statement of the case, and need not be here repeated. At the time of the publication of the article in the San Antonio Daily Express the defendant, Praeger, was a civilian and night editor of the paper. The statements contained in the publication were evidently construed as seriously reflecting upon the officers engaged in the Ft. Reno rifle competition, and upon the trial of Sharp it was thought essential to prove the authorship of the communication and the facts regarding its publication. Evidently for that purpose the defendant was summoned as a witness and was required by the subpœna to produce the communication. Praeger appeared in answer to the subpœna, as did also his counsel, Mr. Bee and Mr. S. J. Brooks, both lawyers of experience, and of character and standing in the community. Praeger was duly sworn as a witness, and, in answer to questions propounded by the judge advocate, stated that he had authorized Sharp to wire him the scores of the competition, or rifle shoot, from day to day and that Sharp had wired him the scores every day during the competition. The witness was then shown a copy of the San Antonio Daily Express containing the article, set out in the statement of the case, and was then asked by the judge advocate the following question:

"Did the accused [meaning Sharp] furnish you any of the facts, in this article, by mail?"

To the question the counsel for Sharp objected. The objection, however, was overruled by the court, and Praeger thereupon made the following response:

"I will say to the court that I have made no evasion in regard to that article, and that on the advice of my lawyer I would like to file my reason with the court for declining to answer this and other questions of that nature."

By permission of the court the following paper, addressed to the president and members of the court, was read by the witness:

"With every respect for the authority of the general court-martial and due respect and obedience to its process, and with personal respect for the individual members of the court, I decline to answer the questions propounded to me by or under the direction of your honorable body. I so decline because of my sincere belief in the lack of right on the part of your body to require me to answer questions the effect of which may tend to incriminate me. I therefore decline to answer any further questions."

Thereupon the court was closed for consultation, and, upon being reopened, the president requested of the judge advocate a legal opinion on the subject of the refusal of the witness to answer. The arguments, submitted by the judge advocate and Mr. Bee, in response to the suggestion of the court, were confined to a discussion of the following points: (1) Was the article published in the San Antonio Daily Express a libelous publication under articles 721–749 of tit. 16, Pen. Code, 1895? (2) If libelous, was Praeger, as night editor of the paper, and the party directing the publication of the article, subject to criminal prosecution for its publication? (3) Was Praeger justified in refusing to answer the question because, in the judgment of himself and his counsel, the answer would tend to incriminate him? Upon the conclusion of the discussion the court sustained the objection

interposed by Praeger and held that he would not be required to answer. At a subsequent session of the court the following questions were propounded to Praeger by the judge advocate:

"Q. Mr. Praeger, you stated in your testimony in this case the first day you were here that you made arrangements with Sergt. Sharp, I believe, whereby he would furnish you with reports from that competition from day to day, did you not? A. Why, yes, I testified I made arrangements with him to telegraph us the scores from day to day, and I gave him a letter to the Western Union, authorizing them to receive, I think, about one hundred words per day on the scores from him. Q. And you also testified that you had received a number of such telegrams or messages from him? A. Yes, sir. Q. Did you have any corrrespondence with anybody at Ft. Reno during that competition?"

The last question Praeger declined to answer. In reply to the judge advocate, who insisted upon an answer, Mr. Brooks, in behalf of the witness, made substantially the following statement: That the prosecution was endeavoring to prove by the witness the responsibility of the article appearing in the San Antonio Daily Express; that the witness could not be required to answer either directly or indirectly with reference to the authorship or the publication of the article, because the article might be construed as libelous under the laws of Texas. In this immediate connection he made the further statement:

"I understand from Mr. Praeger that threats have been made for a prosecution for libel under that article, and we say that no question can be asked of him directly or indirectly drawing any statement with reference to the publication of that article or the authorship of it."

After discussion by counsel and consultation by the court, the objection of the witness was overruled, the court assigning for its action the following reason:

"Mr. Praeger declines to answer this question on the ground that the answer will tend to criminate him. Mr. Praeger admits that he is night editor of the San Antonio Daily Express, and on August 3, 1904, the article in question appeared in this journal. It is presumed by the court that Mr. Praeger objects to answering this question on the ground that a knowledge of this article will tend to subject him to a criminal or civil prosecution for libel. To the court the situation appears as follows: Either Mr. Praeger is responsible for the publication of said article in said journal, in which case he is liable under the law if the article is libelous—the two facts, the publishing of the article unsigned and his position being that of responsibility, being prima facie evidence of his liability, in which case anything he may say with regard to the writing of the article cannot tend to incriminate him further; or Mr. Praeger's position is such that he cannot be personally responsible for the publication of said article, in which case no testimony he can give with regard thereto, can possibly incriminate him. In either case the court fails to see how the answer to this question can tend to incriminate Mr. Praeger, and the question will be answered."

Responding to the judgment of the court-martial Mr. Brooks replied as follows:

"As I have stated before, we have taken the position with all due respect to the court, and we feel that our position is a correct one under the law. And in making this statement as to the legal correctness, I am further confirmed in that view by Mr. Bee, who has been the regular counsel for Mr. Praeger, and it is his candid opinion that any statement he might make would incriminate him, particularly a question like this; and, therefore, having that view of the law, the witness must insist on declining to answer the question."

The witness then answered a number of questions propounded by counsel and the court; and after testifying that Sergt. Sharp did not write the article, which appeared in the Express of August 3, 1904, he was interrogated by a member of the court as follows:

"To the best of your knowledge did Sergt. Sharp furnish the facts or the allegations of it, upon which this article was based?"

The court overruled the objection of Praeger's counsel to the question and held that the witness should answer. The court, it may be remarked, had previously sustained the objection of Praeger's counsel to substantially the same question. In reference to the ruling Mr. Brooks observed:

"As I said before, we are of the opinion that the position we take in reference to the law in this matter is correct, and that the witness would tend to incriminate himself by answering the question, and therefore he must decline to answer it."

The only remaining question in reference to the conduct of Praeger, as a witness, has reference to his failure to produce, in obedience to the subpœna duces tecum, the communication, alleged to have been written by Sharp at Ft. Reno and mailed to him at San Antonio. Touching this communication, Praeger testified that he did not have it in his possession, but declined to answer the question:

"Did you ever have it?"

The record is silent as to the action taken by the court-martial upon the refusal of Praeger to answer this question. It, however, does appear from the testimony of the judge advocate, who was sworn as a witness, that Praeger informed him that he had destroyed all communications that he had received from Sharp. The conversation between the judge advocate and Praeger was detailed by the former in the following language:

"Well, I went to see Mr. Praeger—the first subpœna I served on him I had a conversation with him and asked him if Sergt. Sharp was his correspondent during the competition at Ft. Reno, and he told me that he was, and I asked him if he was the author of that article that appeared in the paper on August 3, 1904, and he hesitated, and I have forgotten the exact words he used, but the impression he left and the substance of the words was that Sergt. Sharp was not the author—did not write the article, but he furnished the facts that appeared in that article. Then I asked him if he could show me that article—the original letter that Sergt. Sharp wrote him concerning these statements, and he told me that he had destroyed all of the communications that were received from Sergt. Sharp, and that he didn't have anything."

Nothing else was required of Praeger before the court-martial and he was dismissed as a witness. It will be observed, throughout the proceeding, that, in declining to answer questions, Praeger merely insisted upon the assertion of the right, which both he and his counsel thought he possessed, of declining to give evidence which might tend to show that he had committed an offense. "It is an ancient principle of the law of evidence," said the Supreme Court in Counselman v. Hitchcock, 142 U. S. 563, 564, 12 Sup. Ct. 198, 35 L. Ed. 1110, "that a witness shall not be compelled, in any proceeding, to make disclosures or to give testimony which will tend to criminate him or subject him to

fines, penalties, or forfeitures." And at pages 565 and 566 the following extract from the opinion of Chief Justice Marshall in Burr's Trial, 1 Burr's Trial, 244, was quoted with apparent approval by the court:

"If the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to 'answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact. * * * According to their statement" (the counsel for the United States) "a witness can never refuse to answer any question, unless that answer, unconnected with other testimony, would be sufficient to convict him of crime. This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule, that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable case, that a witness, by disclosing a single fact, may complete the testimony against himself; and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom, he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself, would most obviously be infringed, by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is attainable, against any individual, the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws."

And again at pages 585 and 586 of 142 U. S., at page 206 of 12 Sup. Ct. (35 L. Ed. 1110) it was said by the court:

"It is quite clear that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect. It is to be noted of section 860 of the Revised Statutes [U. S. Comp. St. 1901, p. 661] that it does not undertake to compel self-criminating evidence from a party or a witness. In several of the state statutes above referred to, the testimony of the party or witness is made compulsory, and in some either all possibility of a future prosecution of the party or witness is distinctly taken away, or he can plead in bar or abatement the fact that he was compelled to testify. We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. In this respect, we give our assent rather to the doctrine of Emery's Case, in Massachusetts, than to that of People v. Kelly, in New York; and we consider that the ruling of this court in Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746. supports the view we take. Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party."

See, also, the following cases more or less in point: Brown v. Walker, 161 U. S. 594, 16 Sup. Ct. 644, 40 L. Ed. 819; Jack v. Kansas,

199 U. S. 372, 26 Sup. Ct. 73, 50 L. Ed. 234; Ballmann v. Fagin, 200 U. S. 186, 26 Sup. Ct. 212, 50 L. Ed. 433; Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652.

While it is thought that, in view of the doctrine of the above cases, the defendant .was within his legal rights in declining to answer the questions propounded, it is not deemed necessary to go to that extent in deciding whether he is guilty as charged in the information.   It may be that his counsel mistook the law in insisting upon his privilege as a witness; it may be that the laws of Texas do not denounce as libelous the article which appeared in the San Antonio Express; it may be that a prosecution for libel under the state laws could only be brought in the state courts, notwithstanding Ft. Sam Houston is a military post within the exclusive jurisdiction of the United States.   Let all these things be conceded; yet the record clearly discloses (1) that Praeger was not actuated by any evil motive or bad intent in refusing to answer questions; (2) that he acted under the legal advice of reputable counsel (see Stewart v. Sonneborn, 98 U. S. 196, 197, 25 L. Ed. 116; Griffin v. Chubb, 7 Tex. 604, 58 Am. Dec. 85); and (3) he had reasonable grounds to believe that, if he made answer to the questions propounded, the answers would tend to incriminate him.   Thus his good faith was made manifest—the very reverse of willful conduct as the word willful is used in penal statutes.

The information also charges that the defendant willfully refused to produce documentary evidence required by the court-martial.   What has already been said by the court applies with equal force to this charge. Whether the court-martial had the right, under any circumstances, to require the defendant to produce a paper which would tend to incriminate him, need not be decided (see Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; Ballmann v. Fagin, supra), since the record makes it reasonably clear that the documentary evidence, described in the subpœna and referred to in the information, had been destroyed, and in the nature of things could not be produced."   Lex non cogit ad impossibilia."

It is, however, contended by counsel for the government that, · although Praeger may have acted within his privilege in refusing to answer objectionable questions, he cannot now insist upon his immunity because the court-martial decided the question against him and its ruling is final and not reviewable by this court.   The exact proposition of counsel is stated in the following language:

"The court-martial having exercised its prerogative of deciding, from all the facts before it, that the witness' objection to answering was based on insufficient ground, its decision in this matter was final and is not subject to review by any civil tribunal."

In this connection it is well to note that the following propositions have been conclusively settled by the Supreme Court:   (1) The acts of Congress, touching army and navy courts-martial in this country, are clearly constitutional.   Ex parte Reed, 100 U. S. 13, 25 L. Ed. 538; Dynes v. Hoover, 20 How. 625, 15 L. Ed. 838.   (2) Where a court-martial has jurisdiction of the person accused and of the offense charged, and acts within the scope of its lawful powers, its decisions

and sentence cannot be reviewed or set aside by the civil courts, by; writ of habeas corpus or otherwise.  Johnson v. Sayre, 158 U. S. 109, 15 Sup. Ct. 773, 39 L. Ed. 914; Dynes v. Hoover, supra; Ex parte Reed, supra; Ex parte Mason, 105 U. S. 696, 26 L. Ed. 1213; Smith v. Whitney, 116 U. S. 167, 6 Sup. Ct. 570, 29 L. Ed. 601; Swaim v. United States, 165 U. S. 553, 17 Sup. Ct. 448, 41 L. Ed. 823; Carter v. Roberts, 177 U. S. 496, 20 Sup. Ct. 713, 44 L. Ed. 861; United States v. Fletcher, 148 U. S. 84, 13 Sup. Ct. 552, 37 L. Ed. 378.  And it may be added that the proposition is true in relation "to every tribunal acting judicially, while acting within the sphere of its jurisdiction, where no appellate tribunal is created; and even when there is such an appellate power, the judgment is conclusive when it only comes collaterally in question, so long as it is unreversed."  Wilcox v. Jackson, 13 Pet. 511, 10 L. Ed. 264.

The principle announced in the foregoing cases is peculiarly applicable to the trial, judgment and sentence of Sergt. Sharp.  The proceedings in that case against him are not reviewable by this, or any other civil court, since the court-martial was legally organized and had jurisdiction of the accused and of the offense charged against him and acted within the scope of its lawful authority.  But does the principle announced prevent the court from inquiring into the charge, preferred by the information, against the defendant Praeger?  It must be remembered that Praeger, a civilian, was before the court-martial only in the attitude of a witness.  That court had no final jurisdiction over Praeger; it was without power to punish him for contempt for refusing to testify (18 Op. Atty. Gen. 278; Rev. St. § 1342, Eighty-Sixth Article of War [U. S. Comp. St. 1901, p. 964]), its authority over him in that regard being limited to a certification of the facts to the United States district attorney.  See act of Congress, approved March 2, 1901, c. 809, 31 Stat. 950, 951 [U. S. Comp. St. 1901, p. 965].  Under the act of Congress the facts only may be certified, and when that has been done it becomes the duty of the district attorney to file an information against and prosecute the offending party.  The proceeding then assumes the form of a criminal prosecution, a direct proceeding, against the offender, who, upon conviction, may be fined not more than $500 or imprisoned not exceeding six months, or, at the discretion of the court, the punishment may include both fine and imprisonment.  In this prosecution, as in all other criminal trials, the burden of proof is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime.  Davis v. United States, 160 U. S. 487, 16 Sup. Ct. 353, 40 L. Ed. 499.  In the latter proviso of section one of the act of Congress it is expressly provided, "that no witness," before a court-martial, "shall be compelled to incriminate himself or to answer any questions which may tend to incriminate or degrade him."  Whether the information in the present case should negative this proviso (United States v. Cook, 17 Wall. 168, 21 L. Ed. 538; Ledbetter v. United States, 170 U. S. 609, 610, 18 Sup. Ct. 774, 42 L. Ed. 1162), or whether the proviso contains purely defensive matter for the defendant to prove, it is not necessary to decide, since, however the fact be made to appear,

evidence showing·an incriminating tendency of answers to questions before the court-martial would operate as a complete defense and therefore as an acquittal of the defendant. This is so because the law is thus written; and certainly there is nothing in the act which, either expressly or impliedly, tends to impart the attribute of conclusiveness to the ruling of a court-martial that an answer to a question would not incriminate the witness. Were the contention admissible there would remain for the court, in the trial of a criminal cause of this nature, to do little except to enter a judgment of conviction, a judgment based not upon facts before the court but upon the legal opinion rendered by a court-martial. Such a proceeding, it is thought, would contravene not only the words of the statute and the plainest principles of right and justice, but would set at naught the safeguards of the constitution which guarantee to a defendant, charged with crime, the right to a fair and impartial trial and to be confronted with the witnesses against him.

The court is therefore of the opinion, upon this branch of the case, that the principle announced by the Supreme Court in Johnson v. Sayre, supra, and other cases of that class, is inapplicable in prosecutions, like the present, arising under the act of 1901.

For the reasons above given, judgment will be rendered in favor of the defendant.