**UNITED STATES v. SHIBLEY.**

No. 22672–CD.

United States District Court
S. D. California, Central Division.

May 11, 1953.

738

Walter S. Binns, U. S. Atty., by Max F. Deutz, Asst. U. S. Atty., Los Angeles, Cal., for the plaintiff.

Kenny & Morris and Daniel G. Marshall, Los Angeles, Cal., for the defendant.

YANKWICH, Chief Judge.

The defendant, George E. Shibley, an attorney, is charged in an information filed on January 28, 1953, with nine counts of violation of article 47 of the Uniform Code of Military Justice, which declares refusal to appear or testify before certain military tribunals an offense against the United States.[1] Its pertinent parts are given in the margin.[2]

1. 50 U.S.C.A. § 622.

2. "§ 622. Refusal to appear or testify (article 47)

"(a) Every person not subject to this chapter who—

"(1) has been duly subpenaed to appear as a witness before any court-martial, military commission, court of inquiry, or any other military court or board, or before any military or civil officer designated to take a deposition to be read in evidence before such court, commission, or board; and

"(2) has been duly paid or tendered the fees and mileage of a witness at the rates allowed to witnesses attending the courts of the United States; and

"(3) willfully neglects or refuses to appear, or refuses to qualify as a witness or to testify or to produce any evidence which such person may have been legally subpenaed to produce;

"shall be deemed guilty of an offense against the United States."

Provision is also made for the trial of such offenses, on information, in a United States District Court, or in a Court of original criminal jurisdiction, in any of the territorial possessions of the United States, and jurisdiction is conferred on such courts for the purpose.[3] It is made the duty of the United States District Attorney or the officer prosecuting for the Government in any court of original criminal jurisdiction, upon the certification of the facts to him by the military tribunal, to file an information against such person, and to prosecute him for violation of the article.[4]

I

## The Information and the Facts Behind It

Of the nine counts, Count three charges refusal to appear on December 8, 1952, before a Court of Inquiry which ordered him to do so on December 4th, 5th and 6th. Of the other counts, one count, Count nine, charges refusal to answer any and all questions which might be addressed to him on December 10, 1952. The other seven counts charge refusal to answer specific questions. The questions which the defendant refused to answer as they are set forth in the information, and the dates on which the refusals occurred are:

"Count 1: (December 4, 1952)

" 'Q. Mister Shibley, did you receive authorization or permission on behalf of your client to write the entire letter of August 26, 1952?'

"Count 2: (December 6, 1952)

" 'Q. Yesterday, I inquired from you with reference to your statement that you could not attend the hearing of 18 August because you were on a business trip to San Francisco. At that time you told us that you would check last evening and inform us this morning if such were the case. I now ask you that question, were you on a business trip to San Francisco on 18 August 1952?'

"Count 4: (December 9, 1952)

" 'Q. Mr. Shibley, you state on page

18 of your letter after the numeral 6, and I quote, "That you forthwith take effective means and measures to investigate the violations of the Uniform Code of Military Justice and the Manual for Courts-Martial at the El Toro Marine Corps Air Base, and also investigate the non-service income and activities of the named officers and each of them." Do you know of your own knowledge that any officer referred to is receiving non-service income?'

"Count 5: (December 9, 1952)

" 'Q. Mr. Shibley, referring to your letter to the Commandant of the Marine Corps, and on page 18 thereof, the following statement is contained, and I quote: "I further respectfully demand that this letter not be referred to Colonel Bigler since I am informed and believe that he has already discussed this matter a great length with General Megee and with others of the officers named, and that he has already prejudged the case, and that several of the unlawful acts committed by the named officers have been attributed by him to the advice of Colonel Bigler." My question is, which of the named officers attributed his commission of an unlawful act to the advice of Colonel Bigler?'

"Count 6: (December 9, 1952)

" 'Q. Mr. Shibley, I refer you to page two of your letter to the Commandant wherein you state, and I quote, "Lieutenant Colonel Endweiss has made it known that he believes his promotion to full Colonelcy depends on the conviction of Lieutenant Adams." My question is, did he make it known to you?'

"Count 7: (December 9, 1952)

" 'Q. Mr. Shibley, I again refer you to page two of your letter to the Commandant wherein you state, "Lieutenant Colonel Endweiss has made it known that he believes that his promotion to full colonelcy depends on the

3. 50 U.S.C.A. § 622(b).

4. 50 U.S.C.A. § 622(c).

conviction of Lieutenant Adams," and I ask you if you overheard Colonel Endweiss make such a statement or do you know of anybody who heard him make such a statement?'

"Count 8: (December 10, 1952)

"'Q. Do you recall whether or not on 2nd, 3rd, 4th, and 5th day of September you appeared in the Long Beach court as attorney for MacCagnon?'"

As to each of the counts charging refusal to answer a specific question or all questions, the information alleges (a) that the defendant was subpoenaed to appear as a witness before a Court of Inquiry convened by the Commanding General, Aircraft, Fleet Marine Force, Pacific, appointed by letter, serial 29612, dated November 25, 1952, in the United States Marine Corps Air Station, El Toro (Santa Ana), California; (b) that he was duly paid or tendered the fees at the rates allowed to witnesses attending the Courts of the United States; and (c) that he appeared, was sworn and asked a particular question, and, on being ordered by the Court to answer, (d) unlawfully refused to answer a particular question or all questions.

As to Count three, it is alleged that he was subpoenaed to appear, and, after appearing on the 4th, 5th and 6th of December, 1952, and being ordered to return on December 8, 1952, to testify further, he "willfully" neglected and refused to appear.

In response to a request for a bill of particulars, the Government tendered into court a transcript of the proceedings before the Court of Inquiry on the dates on which the defendant appeared, and certain documents attached thereto. They disclose the background of the present proceeding.

The defendant represented before a court-martial Master Sergeant John Russell Bennette of the United States Marine Corps, who, on August 4, 1952, was sentenced to certain punishment for infringement of military law and regulations.

In conjunction with the appeal to the Commandant of the United States Marine Corps, the defendant attacked the regularity of the proceedings, and made certain charges of misconduct against certain officers of the Marine Corps stationed at El Toro.

A communication from the Commandant of the Marine Corps to the local Commanding General, dated October 29, 1952, stated that a full report as to the "enclosures to references" was necessary, in order that "appropriate replies" be made.

It was urged that "the trial of Master Sergeant Bennette and the review thereof be expedited". "Full report" was asked "covering the matter", upon completion of action.

■ A court of inquiry need not be authorized in a specific manner. The full report asked concerned not only the trial of the Master Sergeant, but also the charges against the officers made in his appeal. These were referred to as "enclosures to references".

Such report could not be made without convening a court of inquiry. So the local Commanding General, *in obedience to the communication of October 29, 1952,* convened a court of inquiry to consist of certain high ranking officers of the Marine Corps other than himself. Counsel and assistant counsel for the court were designated.

The Court was directed to notify Lieutenant Colonel Charles E. Endweiss, United States Marine Corps, the Commanding Officer, Service Squadron, Aircraft, Fleet Marine Force, Pacific, as a party to the inquiry. The proceedings were ordered to be in closed session.

On November 25, 1952, a subpoena for the appearance of the defendant as a civilian witness on the 4th day of December, 1952, was served on him. He appeared on that day, and on the 5th and 6th of December, 1952, when he was directed to appear on the 8th of December, 1952. He, not having appeared on that day, a Warrant of Attachment was issued on December 9, 1952, and served on him. He was then taken before the court on that day. He was also before the court on December 10. 1952, but refused to answer first

a specific question and then any and all questions. There is also in evidence a certificate dated December 9, 1952, showing the tender of one day's witness fee, and a later voucher for additional fees in the sum of $16.95 duly tendered.

The defendant has filed a motion to dismiss the complaint as amended by the facts disclosed in the Bill of Particulars. The Motion goes into great detail in attacking the validity of the information. The chief contention is that the complaint fails to show the jurisdiction of the Court of Inquiry. The particular grounds of challenge will be referred to more specifically in the discussion to follow.

## II

### Confidential Communications

■ We may dispose briefly of the contention stressed at the oral argument that the matters as to which the questions were asked called for the disclosure of confidential communications between the attorney and client, in violation of the California Code and the accepted Code of Ethics of the Bar.[5] The object of the privilege is to protect the client against disclosure of confidential matters. In order to achieve this result, it is necessary that the communication be, as Wigmore puts it,

> "made with the intention of confidentiality."[6]

An oft-quoted statement of Lord Eldon, when Lord Chancellor, expresses the reverse of the situation:

> "The moment confidence ceases,
> privilege ceases."[7]

And the Courts of California have held repeatedly that the privilege does not extend to matters communicated to the attorney with the intention that he communicate them to others.[8] This rule applies not only to communications which are made with such intent, but also to those which the attorney, in discharge of his duty to his client, finds it necessary to disclose.[9]

■ The defendant in this case, in the course of his representation of his client, sent to the Commandant of the Marine Corps certain letters and communications in which certain charges were made. The object was not only to secure a revision of the sentence, but also to make certain charges against officers of the Base. The new Code of Military Justice, article 138,[10] specifically provides for complaints against wrongs by any member of the Armed Forces. It makes it the duty of the superior officer to whom the complaint is addressed, to forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. Whether the letter written by the defendant is treated as a complaint for redress of grievances, or as an appeal to a higher authority in conjunction with the revision of sentence, (*it was, in fact, both*) it is evident that the information it contained must have been furnished by Bennette with the object that it be revealed to others. Otherwise, it would do him no good. As courts of inquiry may be convened to investigate any

---

5. California Code of Civil Procedure, § 1881(2).

6. 8 Wigmore on Evidence, 3rd Ed., 1940, Sec. 2311.

7. Parkhurst v. Lowten, 1819, 2 Swanst. 194, 216; 36 Engl.Rep. 589, 596. The entire paragraph in which the sentence occurred is worth quoting:

 "The privilege which he claims is the privilege, not of the attorney, but of the client, and is founded on this consideration, that there would be no safety in dealing with mankind, if persons employed in transactions ·were compelled to state that which they have learned only by this species of confidence; but

the moment confidence ceases, privilege ceases, and the attorney must answer as any other witness * * *"
And see, Greenough v. Gaskell, 1833, 1 Myl. & K. 98, 104; 39 Engl.Rep. 618, 621.

8. Ferguson v. McBean, 1891, 91 Cal. 63, 73, 27 P. 518, 14 L.R.A. 65; Keohane v. Keohane, 1919, 38 Cal.App. 405, 408, 176 P. 386; Franzen v. Shenk, 1923, 192 Cal. 572, 584, 221 P. 932; Solon v. Lichtenstein, 1952, 39 Cal.2d 75, 79, 244 P.2d 907.

9. 58 Am.Jur.: Witnesses, § 491.

10. Article 138, Uniform Code of Military Justice, 50 U.S.C.A. § 734.

matter, article 135,[11] the court had the right to inquire into the statements made in the letter. As I stated at one of the hearings in this matter, if a person employs an attorney with the understanding that certain information be transmitted to a third party for the purpose of securing a benefit to the client, and the attorney communicates such information, then not only the specific information, but the more detailed circumstances relating to it may be gone into. The cases already cited are illustrative of the point.[12] Thus, in one of them in which an attorney was directed to inform another person of the purpose for which a deed was being made, the Court held that the privileged character of the communication was destroyed, and that the attorney could testify not only to what he told the third person, but to what his client told him

· "concerning the purpose of the conveyance."[13]

The following sentence from the opinion in the case just referred to has special significance in this case:

"An attorney who acts as a conduit through which a conveyance is made may testify as to the circumstances attending its execution."[14]

Here, the client communicated certain facts to the defendant with the intent that they be conveyed to higher authorities, either as grievances, or as grounds for revision of sentence. The defendant became the "conduit" for such purposes. And the circumstances under which they were communicated to the defendant became open to inquiry. After making these charges, in order to serve his client's purpose, the defendant could not attempt to shield him under the plea of privilege by refusing to disclose the circumstances of their *communication to him*. The secrecy of communications between attorney and client should be held inviolate. But when the client and attorney themselves, for purposes beneficial to the client, lift the veil, they cannot lower it again.

### III
### The Powers of Courts of Inquiry

We come now to a more direct attack on the power of the court of inquiry to compel the appearance and attendance of the defendant.

■ As stated at the outset, a study of the Uniform Code of Military Justice (to be referred to as "the Code"), and the Manual for Courts-Martial of the United States, promulgated by the President of the United States, and effective on May 31, 1951, which carried into effect the Code of May 5, 1950, (to be referred to as "the Manual"), shows a clear intent to give to courts of inquiry the same power to enforce obedience to summons of witnesses, whether military or civilian, that the courts-martial had.

■ Courts of inquiry are an old institution of the military establishment of the United States. Like courts-martial, they are courts of special and limited jurisdiction. Indeed, the older concept was to consider courts-martial instruments of executive power.[15] Unlike courts-martial, the proceedings of courts of inquiry do not in-

---

11. 50 U.S.C.A. § 731.

12. See cases in Note 8.

13. Keohane v. Keohane, 1919, 38 Cal.App. 405, 408, 176 P. 386, 387.

14. Keohane v. Keohane, supra, 38 Cal. App. at page 408, 176 P. 387.

15. The character of courts-martial has been established in a long series of decisions. In one of the earliest on the subject, In re Egan, C.C.N.Y.1866, Fed. Cas.No.4,304, p. 367, 5 Blatch. 319, Nelson, Circuit Judge, defined courts-martial under the law of England and the United States in this manner:

"The law officers of the crown in England, in giving their opinion in the matter of the insurrection in the Island of Jamaica, observed, that courts martial, a they are called, by which martial law is administered, are not, properly speaking, courts martial or courts at all. They are mere committees, formed for the purpose of carrying into execution the discretionary power assumed by the government."

In later decisions, [and *some* of an earlier date] this theory was abandoned. Courts-martial are now given the status of courts of special and limited jurisdiction. See, Dynes v. Hoover, 1857, 20 How. 65, 75–76, 15 L.Ed. 838; Kurtz v. Moffitt, 1885, 115 U.S. 487, 601, 6 S.Ct.

volve a trial of issues in which anyone is formally a party. Their traditional function, both in this country and in England, has been to investigate and advise whether further proceedings shall be had.[16]

An old case in the Court of Claims sums up the purpose of courts of inquiry in language which is almost identical with Article 135 of the Code:

"A naval or military court of inquiry is not a judicial tribunal. It is instituted solely for the purpose of investigation, as an assistance to the President, the head of the Department, or the commanding officer, in determining whether or not any further proceeding, executive or judicial, ought to be taken in relation to the subject matter of the inquiry. There is no issue joined between parties, and its proceedings are not judicial." [17]

The Code has broadened its scope to the extent of allowing a person subject to military justice to be designated as a party. Indeed, a person who has a direct interest in the object of inquiry, if not so designated, may ask the court for a designation. In the letter of designation in this case, one of the officers against whom charges had been made in these communications, was made a party with direction that he have due notice of all proceedings as required by the Code.[18]

The Code has this significant provision:

"Witnesses may be summoned to appear and testify and be examined before courts of inquiry as provided for courts-martial." [19]

Article 136, relating to authority to administer oaths, includes among the persons authorized to administer oaths,

148, 29 L.Ed. 458; Runkle v. United States, 1887, 122 U.S. 543, 555-556, 7 S.Ct. 1141, 30 L.Ed. 1167; Givens v. Zerbst, 1921, 255 U.S. 11, 19, 41 S.Ct. 227, 65 L.Ed. 475; Collins v. McDonald, 1922, 258 U.S. 416, 418, 42 S.Ct. 326, 66 L.Ed. 692; Powers v. Hunter, 10 Cir., 1949, 178 F.2d 141, 143, 15 A.L.R.2d 381. And see, 36 Am.Jur., Military Law, Secs. 88, 93; 6 C.J.S., Army and Navy, § 51; Snedeker, 1953, Military Justice, Sec. 203, pp. 43-48. While there is no presumption in favor of their jurisdiction, the inquiry, when it is challenged before civilian courts, is limited to the question whether they had the power to hear and determine. This usually implies inquiry into these matters: (1) Was the court legally constituted; (2) Did it have jurisdiction of the matter; (3) Were the statutory regulations governing its proceedings complied with, and (4) Did the sentence conform to law. See, Runkle v. United States, supra; In re Yamashita, 1946, 327 U.S. 1, 6, 66 S.Ct. 340, 90 L.Ed. 499; Johnson v. Eisentrager, 1950, 339 U.S. 763, 765, 786-787, 70 S.Ct. 936, 94 L.Ed. 1255.

16. 8 Opinions, Attorney General, 1857, 335, 346-347; 25 Opinions, Attorney General, 1906, 623, 625; 6 C.J.S., Army and Navy, §§ 48-50.

17. Walter B. Chester's Owners v. United States, 1884, 19 Ct.Cl. 681, 683.

18. 50 U.S.C.A. § 731(c).

19. 50 U.S.C.A. § 731(f). If the only method of making this provision effective were resort to prosecution under section 622 of Title 50 U.S.C.A., the result would be ineffective and illusory. Punishment as an offense cannot compel disclosure to make an inquiry effective. And if boards of inquiry are to perform their functions of making preliminary investigations which result in findings, and, when requested, express opinions, they can do so only if means exist to bring summarily recalcitrant witnesses before them. And the warrant of attachment traditionally provides such means. The suggestion has been made that only civil courts can compel appearance before a board of inquiry after a civilian witness' refusal. And reference has been made to the provisions in the old immigration statute, Title 8, U.S.C.A. § 152, and to the Internal Revenue Code, 26 U.S.C.A. § 3615(e), which, while giving to immigration inspectors and collectors of Internal Revenue, respectively, the power to summon witnesses, compel them to resort to the district courts to *enforce* appearance after neglect or refusal to obey the summons issued. This remedy, if it existed, would be equally visionary. It would tie the military tribunals to the civil courts, contrary to the spirit of military law. More, there is not in the Code a provision similar to either of the sections. Its absence indicates that the means to compel appearance must exist in the court of inquiry itself. Otherwise, the courts are given the naked power to summon, but no power to use a summary method to compel appearance.

"The president and the counsel for the court of any court of inquiry".[20] The courts of inquiry, while not allowed to express opinions or make recommendations, unless required to do so by the convening authorities, are commanded to "make findings of fact".[21] It would be unrealistic to hold that, although their power to summon witnesses are the same as those of courts-martial, the means for making these powers effective,—by issuing a warrant of attachment,—is absent. Article 46 of the Code,[22] when read in conjunction with the provision of Article 135(f),[23] gives to courts of inquiry, in view of their broadened scope, the same power to compel appearance of witnesses as courts-martial have. The Manual so interprets the Code.[24] More specifically, it authorizes the trial counsel to subpoena any civilian who is a material witness.[25] A method of service is prescribed.[26] Provision is made for payment or tender of fees for one day actual attendance and mileage both ways.[27] And finally, it specifically provides for a warrant of attachment in the following paragraph:

"In order to compel the appearance of a civilian witness in an appropriate case, the trial counsel will consult the convening authority or the court, according to whether the question arises before or after the court has convened for trial of the case, as to the desirability of issuing a warrant of attachment (app.19) under Article 46."[28]

Significantly, and in order to show that it is the intent that the power be exercised when necessary, but that *it be not abused*, the next paragraph reads:

"As the arrest of a person under a warrant of attachment involves depriving him of his liberty, the authority for such action may be inquired into by a writ of habeas corpus."

As already appears, this interpretation is logical and necessary, if the power to compel attendance of witnesses is to be effective. More, it is an authoritative interpretation by the President and the military establishment, entitled to great weight.[29] So the objection to the information, and especially to Counts 4, 5, 6, and 7, based on fail-

20. 50 U.S.C.A. § 732(b) (2).

21. 50 U.S.C.A. § 731(g).

22. 50 U.S.C.A. § 621.

23. 50 U.S.C.A. § 731(f).

24. M.C.M., 1951, Sec. 115.

25. M.C.M., 1951, Sec. 115(d).

26. M.C.M., 1951, Sec. 115(d) (1).

27. M.C.M., 1951, Sec. 115(d) (2).

28. M.C.M., 1951, 115(d) (3).

29. M.C.M., 1951, 115(d) (3). In interpreting military law, civil courts give great weight to established military interpretations. See, U. S. ex rel. Hirshberg v. Cooke, 1949, 336 U.S. 210, 216–217, 69 S.Ct. 530, 93 L.Ed. 621; Hiatt v. Brown, 1950, 339 U.S. 103, 109, 70 S. Ct. 495, 94 L.Ed. 691. The interpretation which the Manual embodies giving to courts of inquiry the power to issue warrants of attachment is of long standing in the Army and Navy: It is found, among others, in the following authoritative official manuals: A Manual for Courts-Martial, U. S. Army (1928) (corrected edition to April 20, 1942), pp. 87–88; where it is applied to *all cases of refusal to appear* and testify, including those of

civilian witnesses under article 23 of the Articles of War, the predecessor of section 622, Title 50 U.S.C.A. In Naval Courts and Boards, 1937, Sec. 256, it is provided:

"256. Same: Warrant of Attachment. In order to compel the appearance of a civilian witness in certain exceptional cases, under the circumstances hereinafter set forth, it may become desirable to resort to a warrant of attachment.

"In such cases the proper procedure is as follows: The president of the court will issue a warrant of attachment, directing and delivering it for execution to an officer designated for that purpose, generally the provost marshall of the court. He will also deliver to this officer the subpoena, indorsed with affidavit of service (to be returned when the warrant is executed), and a certified copy of the order appointing the court martial. A warrant, or writ of attachment, does not run beyond the State, Territory, or District (of Columbia) in which the court martial sits."

This section must be read with the preceding Section 255 to which it refers. The word "same" refers to the subtitle of Section 255, "When subpoena is disregarded". Section 255 states that it ap-

ure to answer after attachment, is not well founded.

## IV

### The Sufficiency of the Information

We now return to the information. As already appears, eight counts of the information charge failure to answer. One count of the information, count three, charges refusal to answer. This count is the only one in which the word "willfully" is used. The other counts which charge refusal to answer, use the adjective "unlawfully".

The rigorous requirement of the older cases[30] that an information set forth, in addition to the language of the statute, a particularization of all the elements of the offense, has been abandoned in later cases. Since the decision in Hagner v. United States,[31] indictments and informations couched in the language of a statute have been uniformly upheld, and have been found sufficient if they apprised the defendant of the nature of the offense, even if one of the elements of the offense was not specifically alleged, but had to be inferred from a reading of the entire indictment or information.[32]

A study of the indictment shows that the counts which charge failure to answer, al-

lege, in the language of the statute, (a) that the defendant had been duly subpoenaed as a witness before a court of inquiry convened by the Commanding General, (b) that he was duly paid or tendered the mileage of a witness at the rate allowed to witnesses attending the courts of the United States, (c) that he was sworn and asked certain questions, (d) was ordered by the court to answer, and (e) that he unlawfully refused to answer.

These are the elements of the offense. Each count recites them with specific details as to names, time and place, and the addition of the word "unlawfully". Count three which charges failure to appear, uses the word "willfully". The wording of the section indicates that the word "willfully" qualifies the words "neglects or refuses to appear". For the codifiers followed the phrase with a coma. And when they made refusal to qualify as a witness, and to testify, distinct offenses, they used the words "or refuses to qualify as a witness" etc. Clearly, the modifier "willfully" applies only to the acts immediately following it, which are a distinct and separate offense. I cannot follow the old decision of the Texas District Court,[33] which, in interpreting the statute which preceded this section,[34] held that "willfulness" was

---

plies to the case of a civilian "duly subpoenaed before a court-martial or court of inquiry". It is evident that, according to this authoritative interpretation, the powers to be exercised concern both courts-martial and courts of inquiry. This codification is a revision of a preceding edition dated 1923. We have not traced these Manuals to their earliest antecedents. This would serve no useful purpose. A twenty-five or thirty year period is sufficient to show long-established interpretations by the military establishment. Similar language is contained in Manual for Courts-Martial, U. S. Air Force, 1949, § 105(b), pp. 115–116. So, when the President of the United States, in 1951, pursuant to the power vested in him by the Congress to prescribe, by regulations, "the procedure" in courts of inquiry, Article 36, 50 U.S.C.A. § 611, gave recognition to this long-standing interpretation of the Armed Forces, which found in courts of inquiry the power to issue warrants of attachment, civil courts should not, in the absence of a direct legislative mandate to the contrary,

deprive courts of inquiry of such power. And, of course, a warrant of attachment is nothing more than a method of "procedure" to enforce the granted power to summon witnesses.

30. United States v. Hess, 1888, 124 U.S. 483, 486–487, 8 S.Ct. 571, 31 L.Ed. 516; Evans v. United States, 1884, 153 U.S. 584, 587–588, 14 S.Ct. 934, 38 L.Ed. 830.

31. Hagner v. United States, 1932, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861.

32. Hopper v. United States, 1943, 9 Cir., 142 F.2d 181; Johnston v. United States, 9 Cir., 1944, 145 F.2d 137; Rose v. United States, 9 Cir., 1945, 149 F.2d 755, 758; Robinson v. United States, 9 Cir., 1949, 175 F.2d 4, 8; United States v. Bent, 8 Cir., 1949, 175 F.2d 397, 400; Warren v. United States, 10 Cir., 1949, 177 F.2d 596, 600–601; Drown v. United States, 1952, 9 Cir., 198 F.2d 999, 1005.

33. United States v. Praeger, 1907, D.C. Tex., 149 F. 474.

34. 31 Stats. c. 809, pp. 950–951, U.S.Comp. Stats.1901, p. 965.

an element of all the offenses included in the section. A study of the opinion indicates that it was based upon the rule of the old cases already referred to,[35] which has long been abandoned. More, the criminal rules now specifically provide:

"The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." [36]

So I am unwilling to make "willfullness" an element of all the offenses under this section when Congress chose to apply it to certain acts only. More, the trend at the present time, even when willfullness is an element, is to consider it a matter of proof.[37]

I am also of the view that the omission from the information of an allegation that the defendant was a "person not subject to" the act, is immaterial. Even assuming that it may be necessary to show that he was not amenable to military discipline, I do not think that the failure to so designate him is fatal to the information. Many instances exist of informations which have been upheld, although they did not specifically state that the persons were not within an exempt group.[38]

Thus, under the Harrison Anti-Narcotic Act,[39] which exempted from its penal provisions physicians who prescribe drugs in the regular course of their practice, indictments which failed to allege that the defendant was a physician, or that he was a person required to register under the Act, were held sufficient.[40] While the courts, in deciding some of these cases, took into consideration a special clause of the Act,[41] which provided that it shall not be necessary in an indictment to negative certain exceptions, the decisions were grounded also upon the well-established rule of long standing in the federal courts, that an exception created by proviso, whether contained in the same or other sections of a statute, is defensive matter and need not be negatived in an indictment.[42] Many cases exist applying this rule to a great variety of statutes, such as statutes relating to public lands,[43] securities,[44] the Federal Reserve system,[45] and many recent regulatory war statutes.[46]

The basic idea behind these decisions is that if an indictment or information informs the defendant of the nature and the elements of the offense with which he is charged, it is adequate. For he is thereby enabled to make his defense, and to plead the judgment as a bar to any future prosecution for the same offense. And, as stated by the Court of Appeals for the Ninth Circuit,

35. See cases in Note 30.

36. Rule 7(c), Federal Rules of Criminal Procedure, 18 U.S.C.A.

37. Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288.

38. See cases, infra, Notes 40–46.

39. U.S.Comp.Stats.1916 § 6287(g) et seq.; 26 U.S.C.A. § 2550 et seq.

40. Brown v. United States, 5 Cir., 1924, 2 F.2d 589; Weare v. United States, 8 Cir., 1924, 1 F.2d 617, 620; Coleman v. United States, 9 Cir., 1925, 3 F.2d 243; Glatzmayer v. United States, 5 Cir., 1936, 84 F.2d 192; Nigro v. United States, 8 Cir., 1941, 117 F.2d 624, 629, 133 A.L.R. 1128. And see, United States v. Holmes, 7 Cir., 1951, 187 F.2d 222, 224–225.

41. U.S.Comp.Stats., 1916, § 6287(n) [now 26 U.S.C.A. § 3224(c)], which read: "That it shall not be necessary to negative any of the aforesaid exemptions in any complaint, information, indictment, or other writ or proceeding laid or brought under this Act; and the burden of proof of any such exemption shall be upon the defendant." 38 Stat. 789. And see, Nelson v. United States, 5 Cir., 1924, 298 F. 93, 94.

42. Ledbetter v. United States, 1898, 170 U.S. 606, 18 S.Ct. 774, 42 L.Ed. 1162.

43. McKelvey v. United States, 1922, 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301.

44. Edwards v. United States, 1941, 312 U.S. 473, 482, 61 S.Ct. 669, 85 L.Ed. 957.

45. Ruffino v. United States, 9 Cir., 1940, 114 F.2d 696.

46. Taylor v. United States, 9 Cir., 1944, 142 F.2d 808, 814; Rose v. United States, 9 Cir., 1945, 149 F.2d 755, 758; Maloof v. United States, 9 Cir., 1948, 159 F.2d 62, 64; Fippin v. United States, 9 Cir., 1947, 162 F.2d 128, 131; Fredrick v. United States, 9 Cir., 1947, 163 F.2d 536, 644.

"It was not a burden of the Government to negative in the information exceptions which might exculpate the accused from liability under the Act."[47]

It is evident, therefore, that the omission of the words in the information negativing the fact that the defendant is in the military service related to a purely defensive matter. More, the transcript and the documentary evidence furnished to the defendant as a Bill of Particulars, clearly indicate that he was a civilian to whom the section applied. So he has no reason to complain.

V

## Partiality of the Court of Inquiry

█ A rather unusual objection is raised to the composition of the Court of Inquiry. As the Court of Inquiry is merely an investigatory body, until it does act to the prejudice of a witness called before it, the witness cannot challenge, either in that proceeding or in subsequent proceedings, its impartiality. No objection was made to the composition of the court on the ground of lack of impartiality. There is no provision in the Code for such objection. The only provision found is that

"No person who has acted as member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case shall subsequently act as a staff judge advocate or legal officer to any reviewing authority upon the same case." [48]

█ The defendant *was not* a defendant before a court-martial. Conceding that impartiality should be the basis of justice and that he who sits in judgment as a judge, with power to act, should be like Chevalier Bayard, *sans peur ni reproche*, and "hold the balance nice, clear and true", the defendant here is not in a position to urge as an excuse for his disobedience, the objection he may have had to the composition of the Court of Inquiry. In Sergeant Bennette's appeal, dated August 26, 1952, all the eleven specifications of error relate to alleged errors in law. The requests for revision, five in number, relate to these errors of law. A sixth suggests an inquiry into the "non-service income and activities" of certain officers. It appears from the other exhibits that the only person against whom serious charges of non-service income and activities were made was Lt. Colonel Charles E. Endweiss. The constituting letter did not make him a member of the Court of Inquiry, but declared him to be a party interested to whom notice should be given. I cannot see how any of these facts could affect the status of the Court of Inquiry, so far as the defendant is concerned, *who was merely a civilian witness before it.*

█ A court of inquiry does not exercise judicial function. It can only express opinions *when requested to do so*, and make findings of fact. It cannot punish anyone, least of all a civilian witness. Even if we are willing to apply to the members of a court of inquiry the rigid requirements of the Judicial Code relating to judicial bias and prejudice [49], none of the charges made against any of the officers would constitute disqualifying bias. All that is alleged is misinterpretation, misapplication of the law, and abuse of their power in the trial of Sergeant Bennette. Violations of the law relating to their extra-service activities, while they might affect their honor as officers, would not affect their competency as members of a court of inquiry.

47. Taylor v. United States, supra, 142 F. 2d at page 814.

48. 50 U.S.C.A. § 556. Supplementing this, the Manual provides as ground for challenge of members of general and special courts-martial, that a member is disqualified under the Code and other grounds such as that he is an accuser, he will be a witness, or he has expressed an opinion as to the guilt or innocence of the accused. Manual for Courts-Martial, § 62(f). It is to be noted that none of these challenges relates to *Courts of Inquiry.* Indeed, to carry into effect the provisions of the Code, it is provided, as a ground for challenge, that a member *has acted as an investigating officer.* He could act so only in conjunction with a board of inquiry, preliminary to trial.

49. 28 U.S.C.A. § 144.

748

▪▪▪▪ The meaning of bias and prejudice which disqualifies a judge in federal courts has been stated in a leading case in this manner:

> "The basis of the disqualification is that 'personal bias or prejudice' exists, by reason of which the judge is unable to impartially exercise his functions in the particular case. *It is a provision obviously not applicable save in those rare instances in which the affiant is able to state facts which tend to show not merely adverse rulings already made, which may be right or wrong, but facts and reasons which tend to show personal bias or prejudice. It was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise, but to prevent his future action in the pending cause. Neither was it intended to paralyze the action of a judge who has heard the case, or a question in it, by the interposition of a motion to disqualify him between a hearing and a determination of the matter heard. This is the plain meaning of the requirement that the affidavit shall be filed not less than ten days before the beginning of the term."* [50] (Emphasis added.)

Repeated rulings against a litigant, no matter how erroneous, and how vigorously and consistently expressed, are not disqualifying.[51] The federal law does not allow, as does the California statute, another judge to be called in to pass on the question of disqualification.[52] The disqualification is automatic if the facts stated in the affidavit are legally sufficient. For this reason, it is just as much the duty of a judge whose competency is challenged, to reject it, if ungrounded, as it is to sustain it when adequate. As said in one of the cases:

> "His duty to deny the affidavit on insufficient allegations is no less imperative than to allow it on sufficient allegations." [53]

▪▪▪▪ Here we have a case in which an attorney, feeling that his client had been done an injustice, attacks the judgment of a military court vigorously. That attack went before a reviewing court, which considered it. But the existence of a court of inquiry called to investigate his and his client's charges of personal misconduct, cannot be successfully questioned because the judgment against the client was revised. Notwithstanding the revision, the charge of administrative irregularities still remained. The same high command which revised the sentence ordered the investigation of the irregularities contained in the defendant's letter. For reasons best known to him, the defendant chose to make himself "the vehicle" for these charges. Some lawyers deem personal attacks on the members of a court good strategy, especially on appeal, when the judges are not present and are unable to defend themselves. Having adopted this method, the defendant should not be permitted to turn what, if untrue and unprivileged, may have amounted to a libel of certain officers (*he labelled it so before the Court of Inquiry, in pleading self-incrimination*) into a disqualification to inquire into the truth of the charges thus made. The fact that the questions propounded to him sought to trace their source to Sergeant Bennette might indicate that disciplinary action could have been sought against the sergeant, if the charges were unproved. But this was not ground for refusal of the attorney to disclose the source. Over a

50. Ex parte American Steel Barrell Co. and Seaman, 1913, 230 U.S. 35, 43–44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379.

51. Wilkes v. United States, 9 Cir., 1935, 80 F.2d 285, 289; Refior v. Lansing Drop Forge Co., 6 Cir., 1942, 124 F.2d 440, 444; Price v. Johnston, 9 Cir., 1942, 125 F.2d 806, 811–812; Beecher v. Federal Land Bank of Spokane, Wash., 9 Cir., 1945, 153 F.2d 987, 988; Foster v. Medina, 2 Cir., 1948, 170 F.2d 632, 633–634;

Loew's, Inc., v. Cole, 9 Cir., 1950, 185 F.2d 641, 646; Tucker v. Kerner, 7 Cir., 1950, 186 F.2d 79, 83–84, 23 A.L.R.2d 1027.

52. California Code of Civil Procedure, § 170. And see the writer's opinion in Cole v. Loew's, Inc., D.C.Cal.1948, 76 F.Supp. 872.

53. Tucker v. Kerner, supra, 186 F.2d at page 85.

hundred and thirty years ago, the contention that a disclosure by an attorney could be avoided if it tended to show the client to be guilty of a violation of law, was rejected in these words:

"* * * if there are circumstances in this case to which his testimony may be required without violation of confidence, Godfrey cannot decline answering, because his answer would prove simony in the late Mr. Lowten; for the object of such an examination is not to prove simony, but to ascertain how the account is to be taken, and for that purpose it is necessary to prove the contract under which the money was paid, and the times and terms of payment. *The object of the examination being legitimate, the witness, unless in a situation of confidence, must answer, although he fixes third persons with offences.*" [54] (Emphasis added.)

In sum, if the plaintiff and his client are to bear the consequences of their willful act, any complaint on their part can be answered in the words which George Dandin, the chief character in one of Moliere's plays addressed to himself

"Vous l'avez voulu, George Dandin, vous l'avez voulu." You wished it, George Dandin, you wished it.) [55]

## V

### Immunity from Subpœna and Self-Incrimination

In what precedes, we saw that the judicial criteria of impartiality do not apply to Courts of Inquiry, and that even if they did, the nature of the charges here involved are not of a character which would disqualify any of the members of the court.

The provision of article 32 of the Code [56] requiring a pre-trial "thorough and impartial investigation" does not read into the military code the criteria of impartiality applicable to civil judicial tribunals. The failure to comply entirely with it does not affect due process or the jurisdiction of the court. The Supreme Court has made a distinct ruling to this effect in interpreting an identical provision in what was formerly article 70 of the Articles of War.[57]

Mr. Justice Black, writing for a majority of the Court, said:

"We do not think that the pre-trial investigation procedure required by Article 70 can properly be construed as an indispensable prerequisite to exercise of Army general court-martial jurisdiction. The Article does serve important functions in the administration of court-martial procedures and does provide safeguards to an accused. * * * But we are not persuaded that Congress intended to make otherwise valid court-martial judgments wholly void because pre-trial investigations fall short of the standards prescribed by Article 70."[58]

The plea of self-incrimination, whether under the Code [59] or under the Fifth Amendment, is unavailing. Insofar as the questions sought to make Bennette the source of the information, the defendant was not in position to claim self-incrimination for Bennette. The plea is personal and cannot be invoked on behalf of a third person.[60] More, it could not be invoked either by the defendant or by his client because the defendant's letter had contained the charges as to which the questions related. Having made them in

54. Parkhurst v. Lowten, supra, Note 7, page 596.

55. Molière, Le Mari Confondu, Act I, sc. iii.

56. 50 U.S.C.A. § 603(a).

57. 10 U.S.C.A. § 1542.

58. Humphrey v. Smith, 1949, 336 U.S. 695, 697–698, 69 S.Ct. 830, 832, 93 L Ed. 986.

59. 50 U.S.C.A. § 602. The rule is also embodied in Section 0309(i), Navy Supplement, Manual of Courts-Martial, p. 38.

60. United States v. White, 1944, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L.Ed. 1542; Hale v. Henkel, 1906, 201 U.S. 43, 69–70, 26 S.Ct. 370, 50 L.Ed. 652; United States v. Field, 2 Cir., 1951, 193 F.2d 92, 97.

writing, the privilege was waived, and could not be invoked against the disclosure of additional details.[61]

One of the cases referred to by the Supreme Court, in support of the rule that where incriminating facts have been voluntarily revealed, the privilege against self-incrimination "cannot be invoked to avoid disclosure of the details", [62] is very pertinent to the situation which confronts us in this case. It is insisted that the disclosure might subject the witness to prosecution for criminal libel. If so, the case to which the Supreme Court referred [63] contains an irrefutable answer to the contention in one sentence which reads:

"As, however, he has in this proceeding admitted that he wrote the article in question, I think his privilege is waived." [64]

So the contention lacks merit.

 Equally groundless is the assertion that the entire proceeding is invalid because the subpœna was served on the defendant while he was on military premises in his capacity as an attorney for Bennette. The common law rule which renders attorneys while in attendance in connection with the conduct of one suit, immune from service in another, is not a rule of due process, constitutional or other. It is a rule of convenience.[65] When the second suit is related in some manner to the first, the basis for the application of the rule does not exist. Rightly, for the summoning of an attorney in a second related cause could not, in any way, hinder his appearance in the primary cause. As said by the Supreme Court in a leading case:

"From the viewpoint of the due administration of justice in the first suit, the second was as much a part of it as if had been an interlocutory motion to compel the production in court of documents or of property involved in the suit. The case is, therefore, not one where the cause pending before the court is subjected to possible hindrance or delay by service of process in some unrelated suit. The aid of the petitioner already in attendance upon the litigation was demanded in order that the relief prayed might be secured and the cause brought to a final and successful termination. Neither that demand nor compliance with it could prevent his attendance upon the principal cause, as service of process in another court might. Even if we make the assumption that the nonrecognition of such immunity might have discouraged petitioner's participation as counsel, still it would defeat, not aid, the administration of justice in the principal cause to encourage petitioner's voluntary presence by the grant of an immunity which would relieve him from any compulsion either to continue his presence or to answer for his acts affecting the progress of the cause. Judicial necessities require that such immunity should be withheld, and it was rightly denied by the court below.

"It is said that the service of process in this case cannot be deemed an exception to the general rule without assuming the truth of the allegations in the bill of complaint, and that the truth or falsity of the pleadings cannot be assumed. See Page v. M[a]cDonald,

61. Brown v. Walker, 1896, 161 U.S. 591, 597, 16 S.Ct. 644, 40 L.Ed. 819; Powers v. United States, 1912, 223 U.S. 303, 304, 32 S.Ct. 281, 56 L.Ed. 448; United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837, 147 A.L.R. 240; Rogers v. United States, 1951, 340 U.S. 367, 373–374, 71 S.Ct. 438, 95 L.Ed. 344; and see, Wolfle v. United States, 1933, 291 U.S. 7, 15–17, 54 S.Ct. 279, 78 L.Ed. 617.

62. Rogers v. United States, supra, 340 U.S. at page 373, 71 S.Ct. at page 442.

63. Buckeye Powder Co. v. Hazard Powder Co., D.C.1912, Conn., 205 F. 827, 829.

64. California Civil Code, § 47(2). See, Yankwich, It's Libel or Contempt If You Print It, 1950, pp. 292–297. And see, Donnell v. Linforth, 1935, 11 Cal. App.2d 25, 52 P.2d 937; Washer v. Bank of America, 1943, 21 Cal.2d 822, 831–832, 136 P.2d 297, 155 A.L.R. 1338.

65. Lamb v. Schmitt, 1932, 285 U.S. 222, 227–228, 52 S.Ct. 317, 76 L.Ed. 720; Murrey v. Murrey, 1932, 216 Cal. 707, 710, 16 P.2d 741, 85 A.L.R. 1335.

supra, [261 U.S. 446] pages 448, 449, 43 S.Ct. 416 [67 L.Ed. 737]. But the test of the privilege is not the probable success or failure of the suit or proceeding in which the process was served. If it were, the immunity could never be denied. The test is whether the immunity itself, if allowed, would so obstruct judicial administration in the very cause for the protection of which it is invoked as to justify withholding it." [66]

So, assuming that the defendant was, at the time, of the service of the subpoena, acting as counsel for Bennette, and was on the military premises for that purpose, he was not immune from service, because the inquiry was so closely related to the Bennette court-martial conviction as to bring the principles declared in the case just cited into full play.

## VI

### The Method of Serving Subpoenas

As already appears (Part I of this Opinion), each of the Counts of the information alleges participially "and having been duly paid or tendered the fees and mileage of a witness at the rates allowed to witnesses attending the courts of the United States".

Under the provisions of the Federal Rules of Criminal Procedure, service of a subpoena is made

> "by delivering a copy thereof to the person named and by tendering to him the fee for 1 day's attendance and the mileage allowed by law." [67]

The Federal Rules of Civil Procedure which have been in effect since 1938, provide that where the subpoena is issued on behalf of the United States or an officer or agency thereof, fees and mileage need not be tendered.[68] This provision has now been incorporated into the new Judicial Code.[69] The change was made to do away with the anomaly which required the tender

of the fee and mileage by a United States Marshal who had to advance the money out of his own funds. It was stated in the Congress that compliance with the rule requiring tender of one day's fee and mileage would require a Deputy Marshal to carry an average of $500 in cash on any trip to serve process.[70]

The undisputed fact is that the defendant was tendered the first day's fee. He insists, however, that the subpoena was for a session at which he did not testify, and that, while the subpoena was for the 4th of December, he did not testify at the hour when the subpoena was returned. He also urges that there was no pre-payment on subsequent days.

■■■ Granted that pre-payment or tender is a condition precedent to a prosecution under the section,[71] I am of the view that whether we apply the provision contained in the criminal rules or the one codified in the new Judicial Code, there was compliance. While military courts have never been considered a part of the judicial system of the United States, in the modern view,—which I accept,—they are courts, conducted by agencies of the United States. And it is inconceivable that rules applicable to the service of process in other federal courts should not apply in the case of military tribunals. Granted that they are courts of limited jurisdiction. Nonetheless, unless the military code specifically provides otherwise, rules applicable to subpoena of witnesses before civil tribunals apply with equal force to these tribunals.

■■■ There are some old state cases which, in interpreting contempt statutes, have held that the tender of the fee must be repeated every day.[72] The logic of these does not appeal to us. We are dealing, not with a state government, but with the federal government, which acts through a great variety of agencies. When this is the

---

66. Lamb v. Schmitt, supra, 285 U.S. at pages 227-228, 52 S.Ct. at page 319.

67. Federal Rules of Criminal Procedure, rule 17(d).

68. Federal Rules of Civil Procedure, rule 45(c).

69. 28 U.S.C.A. § 1825.

70. See, Reviser's Notes to section 1825, 28 U.S.C.A.

71. 50 U.S.C.A. § 622.

72. Atwood v. Scott, 1868, 99 Mass. 177; Mattock v. Wheaton, 1838, 10 Vt. 493.

case, we cannot establish definite niches for each agency or activity, and insist that the Congress provide a complete procedural scheme in each instance. Of necessity, when there is no provision to the contrary in the Code regulating the agency, resort to the general law is permitted in order to supply any procedural hiatus. So, granting that the section under which this prosecution is instituted makes pre-payment or tender of fees a condition precedent, what constitutes pre-payment or tender must be determined by general federal law, in the absence of a contrary provision in the Code and the Manual.

So the provision of the federal civil rules embodied in the new Judicial Code must be taken into consideration in determining the sufficiency of the information in this respect. Whether we apply it or the federal criminal rule, it is quite evident that there was compliance with the requirement of the section under which the information is drawn.

■■■ There is in evidence a voucher covering the fees for the entire period, which the defendant accepted. This constitutes a waiver of pre-payment. If, as the defendant now asserts, he accepted it under coercion, a question of fact is presented, which, if material at all, can only be determined at the trial.

■ In addition to the point just discussed, which applies to all counts in the information, the additional point is made as to Count 3, that he was not ordered to return on December 8th. I have read the transcript in its entirety. And, while it may be true that in one question which the defendant addressed to the Court on December 6, he asked whether he was excused, it is quite evident from the colloquy which preceded it, that, at all times, it was the intention of the court, for reasons advanced each day, that the "excuse" should apply to further appearance on that day. So that the failure to appear cannot be excused upon the ground that the defendant *thought* that he had been excused. And here is an anomaly which appears from the arguments made in this case. On the one hand, the defendant complains that he was not accorded the usual courtesies as a lawyer. On the other hand, by some method of sublimation, he identifies himself with Bennette as a defendant before the court, and, wresting from the context certain statements, he would excuse his willful action by claiming that he either misunderstood the direction of the court, or that he was not directed to return on December 8th.

We are not dealing with a lay person, but with a lawyer very skillful in matters of this character, and very vigorous in his advocacy. And I cannot find in the record and in the exchange between the defendant and the members of the court any basis for the contention that, either he was not ordered to return, or that he misunderstood the court's direction and thought that he had been "excused as a witness", rather than "excused" from further attendance on the particular day. So, even if it be assumed that, in the absence of a direction to appear at a later date, a new subpoena would have to be issued, the situation did not arise here. And the contention, in this respect, must be rejected.

### Conclusion

In what precedes, we have sought to set forth the reasons for the conclusion reached upon the contentions made. The upshot of the whole matter is this: I am in complete agreement with the defendant as to the importance of fearless advocacy at all times, and especially in times of crisis, and the duty of attorneys to defend persons accused of criminal offenses, regardless of the reaction of public opinion, due to the nature of the offense,[73] and to do this without fear of incurring judicial disfavor or disapproval.[74] And I do not consider it improper or Un-American for any one, lawyer or layman,

73. California Business and Professional Code, § 6068(h). And see, Yankwich, Cause of the Defenseless and Oppressed, 1952, 27 Journal of the State Bar of California, p. 259.
74. Sacher v. United States, 1952, 343 U.S. 1, 12–14, 72 S.Ct. 451, 96 L.Ed. 717; Gallagher v. Municipal Court, 1948, 31 Cal.2d 784, 795–797, 192 P.2d 905; And see, Yankwich, Bill of Rights in Time of Crisis, 1953, The Brief, Phi Delta Phi Quarterly, Vol. 48 No. 3, p. 190.

to invoke the protection of any of the provisions of the American Constitution or the Bill of Rights. They are a mighty shield against oppressive and arbitrary power.

Nevertheless, the fact that the record discloses attempted interrogation by the court of inquiry as to personal matters wholly unrelated to the inquiry does not call for an invalidation of the inquiry insofar as it relates to the matters set out in the information before us. As to them, the inquiry was pertinent.

In what precedes, we have discussed in detail the reasons for our disagreement with the contentions of illegality in the constitution of the Court of Inquiry and in its actions relating to the matter before us asserted by the defendant. And the conclusion is that the information is valid, and that the motions to dismiss should be denied.[75]

[75]. We are not conscious of any point, legal or factual, which has not been discussed. Yet, in a case of this character in which several elaborate arguments have been presented at various times, it becomes impossible, in stating judicial conclusions, to enter into all the ramifications of counsel's arguments. In opinion writing this is not necessary, and it is seldom, if ever, done. But 'I desire to state that *all matters urged, whether treated here or not, have been considered.* Two reasons impel me to do this: (1) That counsel may know that all the matters urged have been considered, and (2) that the Judge of the Criminal Department, to whom the case must be sent for plea and setting, will know that the legal problems presented by the various motions and arguments, oral and written, have all been weighed before arriving at the conclusions here announced.

One other observation. As already appears (Part IV of this Opinion), the factual background of some of the problems was discussed only insofar as it appeared without contradiction, from the transcript of the proceedings filed as a Bill of Particulars. The trial of the case might disclose additional or different facts which may call for a different ruling at the trial without any departure from the legal principles declared in this Opinion. See, United States v. Murdock, 1931, 284 U.S. 141, 149–151, 52 S.Ct. 63, 76 L.Ed. 210. These legal principles become "the law of the case" only to the extent that the factual situation remains unchanged.