Jessie **HILL**, Appellant,

v.

**COMMONWEALTH of Kentucky**, Appellee.

Court of Appeals of Kentucky.

Dec. 3, 1971.

Lester H. Burns, Jr., Burns & Maricle, R. Cletus Maricle, Manchester, for appellant.

John B. Breckinridge, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

OSBORNE, Judge.

The appellant was convicted of voluntary manslaughter in the Whitley Circuit Court and sentenced to ten years' imprisonment. She prosecutes this appeal presenting nine grounds for reversal. As we are of the opinion the judgment will have to be reversed, we will not discuss in detail all of her contentions concerning error in the trial.

The facts out of which this proceeding ensued are as follows: Harold Hill, appellant's husband, was shot and killed by her on November 28, 1968. The evidence concerning what transpired on the occasion was furnished primarily by appellant and one of her sons who resided nearby and was present at the time of the shooting.

Early in the morning on the day of the shooting, appellant went to the home of her son and got him out of bed requesting that he come to her house and expel his stepfather. He accompanied appellant to the home and had a conversation with the deceased in which he persuaded him to leave. This occurred at approximately 3 a. m. After this incident, the son remained with his mother in her home. At about 3:30 a. m. deceased returned and began what the parties described as "slipping" around the house. At that time appellant had five of her children, a daughter-in-law and two grandchildren in the house. The deceased remained around the house for some time, went out and got in his truck and moved it into the driveway and in the process ended up in the backyard. Appellant went out on the back porch and, according to her, a "cussing" match ensued.

Following this, according to her testimony, deceased ran her around the house and she escaped by going in the front door. Deceased went to the back door and proceeded to kick the door down. Appellant then, according to her testimony, ran and got a 32-caliber revolver. However, she stated that she did not get the revolver until after deceased had shot her in the leg. At this point the parties proceeded to a shoot-out. According to appellant her husband was shooting at her and had shot her in the leg, and she commenced shooting and hit the deceased four times with a pistol. She said he shot at her and was still trying to get up after she had expended her ammunition. She then ran to the bedroom and got her son's 12-gauge, single-shot shotgun and three rounds of ammunition. The first blast missed and went into a wastebasket. The second blast was on-the-mark striking the deceased in the head at close range. With this shot, the dispute terminated.

When the trooper arrived, he found appellant in the living room with a bullet wound in her leg. He found her husband's body in the kitchen with a 38-caliber Smith and Wesson revolver in his hands. There were five expended shell casings in the revolver; one live round remained in the revolver. The trooper said that in tracing the trajectories of the bullets it appeared that the 38-caliber revolver had been fired from low on the floor in an upward pattern. He also testified that the deceased at the autopsy had a blood-alcohol content of .27% and that the deceased's reputation for peace and quietude was bad. He introduced photographs to show that the back door had been broken open.

Upon the trial of the action, appellant's chief defense was self-defense. It appears the prosecution's theory of the case was that appellant deliberately lured and enticed her husband to the house on the occasion with a predetermined intent to kill him. The prosecution introduced a witness who testified that appellant had offered him $1000 to kill her husband. A deputy sheriff testified that appellant mentioned to him that

she would like to see her husband killed. The parties were in the process of getting a divorce at the time of the shooting. It had been a rather stormy affair. The divorce court had at one time issued a restraining order against the deceased and at the time of the affray had him under a peace bond. The testimony is rather lengthy but in summary it can be said to show that there was extreme hostility on the part of both parties and that both had shown by their actions a willingness to kill the other.

The first issue of substance raised by appellant is that the trial court erred in not granting a new trial because of the conduct of the jury while it was sequestered at a motel. Appellant introduced affidavits from the motel owner and the desk clerk to the effect that one of the jurors came to the motel office unattended; that two other jurors talked on a telephone; that three rooms were assigned to the ten lady jurors and one room to the two men jurors; that all the rooms interconnected and all had outside entrances and it would be physically impossible for one person to watch all of the jurors at any given period of time. One of the lady jurors, according to the affidavit of the motel clerk, attempted to call a local attorney.

■ In response to these affidavits, the Commonwealth filed counter-affidavits showing that the motel was operated on an isolated hilltop and that there were only five other guests there at the time the jury was sequestered. It is our opinion that these affidavits are not sufficient to warrant the granting of a new trial. In Hudson v. Commonwealth, Ky., 449 S.W.2d 218, we held that when a sequestered juror talked on the telephone the burden was on the Commonwealth to show that no opportunity had been afforded for the exercise of improper influence and the trial court abused its discretion in refusing to grant a new trial. However, in the case before us, the affidavits do not clearly show when appellant first had information of the telephone calls and the alleged jury separation. If appellant had knowledge of these facts before the verdict was returned and failed to make a timely motion for mistrial, the error is waived. See Flannery v. Commonwealth, Ky., 443 S.W.2d 638 (1969). Affidavits alleging irregularities in the conduct of a jury must show when such information came to the attention of the party or his attorney and if they fail to reveal this fact then they are insufficient. See Arnett v. Commonwealth, Ky., 470 S.W.2d 834 (1971). For this reason we do not believe the affidavits filed by appellant in conjunction with her motion and grounds for new trial were sufficient. Therefore, the trial court properly overruled the motion.

■ Appellant next contends the trial court erred in not instructing the jury that she had the right to prevent the deceased from entering or remaining in her home. We do not believe there was any error in the instruction in this respect. The court properly instructed the jury upon the theory of self-defense. The thrust of the decedent's attack was upon the person of the defendant. She had a right to protect her person and we believe this was the only proper issue to submit to the jury under the circumstances. See Bush v. Commonwealth, Ky., 335 S.W.2d 324 (1960).

Appellant's third contention of error centers around the process used in the selection of the jury and the trial court's misuse of a court of inquiry after the verdict had been returned in order to ascertain facts upon which her motion and grounds for new trial were overruled. Appellant supports her contention that the jury was improperly selected with two affidavits. The first is that of the circuit court clerk. In her affidavit, the clerk states that on the morning of the trial a local attorney came to her office and said he wanted to check the jury box.[1] He then took the box and sorted the pieces of paper on which the names of the jurors were listed. He selected certain names and placed them in

---

1. The attorney had no official connection with this case.

an envelope in the jury box along with the remaining loose names. He instructed the clerk to pull the first jurors out of the envelope in the box and, if she ran out, to get the rest out of the box. The clerk states that upon drawing the jurors she took the box into the courtroom and when directed to draw the jury she did not shake the jury box and did not take the envelope out of the jury box, and "when I drew the jury, at the beginning, I drew the names of the jury from the envelope; after the envelope was empty I drew from the jury box loose names therein." The clerk in her affidavit also states that neither appellant nor her attorney knew of this act until May 1, 1969, the day after the trial. The deputy clerk signed an affidavit setting out essentially the same facts as those contained in the affidavit of the clerk except that she did not know the circumstances of how the names were drawn from the box in the courtroom.

On the following day, May 3, 1969, the clerk in another affidavit refuted the affidavit she had signed on the preceding day. In her second affidavit, she states that she was mistaken about the day and case when the local attorney separated the names in the jury box. And, after thinking about it, she now concluded that it was on Wednesday, April 30, 1969, and not on Monday, April 28, 1969, that the local attorney was in her office and the case under consideration at that time was Commonwealth v. Lawson and not appellant's case. The deputy clerk never recanted her affidavit.

On May 8, 1969, the trial judge convened what he termed a "court of inquiry." It was not clear from the record whether this proceeding was instituted by the trial court on its own motion or by the Commonwealth's Attorney. In any instance, neither the appellant nor her counsel was present. It appears the judge asked the sheriff to inform appellant's attorney but he reported to the court that he was unable to contact him. A local attorney who had assisted appellant's attorney in the selection of the jury only during the trial found out on his own about the so-called court of inquiry and attended. He attempted to cross-examine some of the witnesses and was refused this privilege, the court advising him that this was an investigation and not a trial. After one day's hearing the court of inquiry was adjourned until May 15, 1969. It was then reconvened and more testimony was taken. Neither appellant nor her counsel was present at this proceeding. In all, the court heard 28 witnesses at the court of inquiry. On June 20, 1969, appellant and her attorney were present in court for a hearing on a motion and grounds for a new trial. At this time, the trial judge informed appellant and her attorney that the court of inquiry had been conducted and if they so desired they could then recall all of the witnesses and cross-examine them. Appellant's attorney at this time objected to the entire proceeding on the grounds that he was not properly notified of the so-called court of inquiry and given an opportunity to be present and cross-examine the witnesses. The trial court then proceeded to overrule appellant's motion and grounds for a new trial in a lengthy opinion. The facts used by the trial court in justifying its opinion overruling the motion and grounds for a new trial are those facts learned by the court in the court of inquiry. They are recited at length by the trial court and the court of inquiry is pointed out by the trial court as being the basis upon which the facts rest.

The question that must now be determined by this court is whether the trial court abused its discretion in overruling the motion and grounds for new trial based on evidence obtained in a proceeding styled "court of inquiry" at which neither the appellant nor her counsel was permitted to be present and participate. We have found no case wherein a proceeding identical or even similar to that employed by the trial court here has been used. The only statutory authorization for a court of inquiry in this jurisdiction is KRS 25.150. This statute restricts the procedures to the county court and does not authorize a circuit court

to conduct a court of inquiry in any instance. For an exhaustive study of the history and use of a court of inquiry in this jurisdiction, see 58 Ky.L.J. 669, The Pretrial Proceedings with Special Reference to the Kentucky Court of Inquiry by Kenneth E. Vallandingham. It would appear that courts of inquiry are an old institution and originated in the military establishment of the United States. They are courts of special and limited jurisdiction and have a limited function. See United States v. Shibley, D.C.Cal., 112 F.Supp. 734.

Passing for the time being the question of whether a circuit court has jurisdiction to call a court of inquiry, we are of the opinion that this institution cannot be used as a vehicle for a trial court in the course of its proceedings to gather evidence upon its own to use in a pending case before it. To permit its use in the manner in which it has here been utilized would be to deprive a party of the right to be heard by himself and his counsel in all proceedings and to meet the witnesses face to face and to cross-examine. We believe the procedure as used here violates the rights of the accused set out in Section 11 of the Constitution of Kentucky. Anytime a trial court conducts an evidentiary hearing for the purpose of ascertaining facts upon which it is to base a ruling, certainly all parties have the fundamental right to be present and to cross-examine the witnesses. For these reasons, we believe the trial court abused its discretion when it used evidence gleaned in the court of inquiry proceeding to overrule defendant's motion and grounds for a new trial.

Appellant raises several other issues in the case which we will not pass on at this time as it appears they are not likely to reoccur upon a new trial.

The judgment is reversed for a new trial.

All concur.